The Deposition of

# JOHN DAVILLIER

In the Matter of

# BYRON TAYLOR, ET AL

versus

# HD AND ASSOCIATES, LLC, ET AL

Taken On

# SEPTEMBER 04, 2020



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


BYRON TAYLOR, ET AL      * NO. 2:19-cv-10635-ILRL-JVW

VERSUS                   * JUDGE IVAN L.R. LEMELLE

HD AND ASSOCIATES, LLC, * MAG. JANIS VAN MEERVEED
ET AL
* * * * * * * * * * * * * * * * * * * * * * * * *


        The deposition of JOHN DAVILLIER, located in

    New Orleans, Louisiana, taken via Zoom

    videoconference, in connection with the

    captioned cause, pursuant to the following

    stipulations before Denise E. D'Arcourt,

    Certified Court Reporter, located in New

    Orleans, Louisiana, on the 4th day of September

    2020, beginning at 10:18 a.m.

```
 1    REMOTE APPEARANCES:

 2    REPRESENTING BYRON TAYLOR, ET AL:
      Preston L. Hayes, Esquire
 3    HMS Law Firm
      3850 North Causeway Boulevard, Suite 590
 4    Metairie, Louisiana 70002
      (plh@hmsfirm.com)
 5

 6    REPRESENTING JONATHAN CHARLES:
      Justine G. Daniel, Esquire
 7    Casey Denson Law, LLC
      3436 Magazine Street, Suite 7005
 8    New Orleans, Louisiana 70115
      (jdaniel@caseydensonlaw.com)
 9

10    REPRESENTING HD AND ASSOCIATES, JOHN DAVILLIER:
      Jonathan Lewis, Esquire
11    Charles F. Zimmer II, Esquire
      Davillier Law Group, LLC
12    935 Gravier Street, Suite 1702
      New Orleans, Louisiana 70112
13    (czimmer@davillierlawgroup.com)

14    Also present:
                    Jonathan Charles, Ms. Daniel's client
15                  Finn McCants, Law Clerk
                    Emilie Lopez, Monitor
16

17

18

19

20

21

22

23

24

25
```

                        STIPULATION

1       It is hereby stipulated by and among counsel for

2   plaintiff and counsel for defense that the

3   videoconference deposition of

4                     JOHN DAVILLIER

5   taken before Denise E. D'Arcourt, a Certified Court

6   Reporter, by counsel for the plaintiffs, for all

7   purposes, pursuant to notice and to the provisions

8   of the appropriate statutes of the Federal Rules of

9   Civil Procedure.

10      The parties hereto waive all formalities in

11  connection with the taking of said deposition,

12  excluding the reading and signing thereof, the

13  swearing of the witness and the reduction of the

14  questions and answers to typewriting.

15      Counsel for all parties reserve all objections,

16  except as to the form of the question and

17  responsiveness of the answer, at the time of taking

18  said deposition, but they also reserve the right to

19  make objections at the time said deposition or any

20  part thereof may be offered in evidence, with the

21  same rights as if the testimony had been taken and

22  given in Open Court.

INDEX

EXAMINATION BY MR. HAYES . . . . . . . . . . 7

EXAMINATION BY MS. DANIEL. . . . . . . . . 126


NO EXHIBITS ATTACHED BY THE REPORTER.


MARKED QUESTION BY MR. ZIMMER

Page 66, Line 20 to Page 71, Line 13


CERTIFIED QUESTIONS BY MR. HAYES

Page 100, Line 15 to Page 101 to Line 17

Page 103, Line 9 to Page 103, Line 22

```
 1          THE REPORTER:
 2               The attorneys participating in this
 3      deposition acknowledge that I am not
 4      physically present in the deposition room
 5      and that I will be reporting this deposition
 6      remotely pursuant to Federal Rule of Civil
 7      Procedure 29.  They further acknowledge
 8      that, in lieu of an oath administered in
 9      person, the witness will verbally declare
10      his testimony in this matter is under
11      penalty of perjury.  The parties and their
12      counsel consent to this arrangement and
13      waive any objections to this manner of
14      reporting.
15               Please indicate your agreement by
16      stating your name, firm, party represented
17      current location, and your agreement on the
18      record.
19      MR. HAYES:
20               Preston Hayes, HMS Law Firm,
21      representing Byron Taylor, Lonnie Treaudo,
22      Terraine Dennis, Kenneth Hunter, and Kendall
23      Matthews, as well as the opt-in plaintiffs,
24      and I'm in Madisonville, Louisiana and I
25      agree.
```

1    MR. ZIMMER:

2        Charles Zimmer on behalf of the

3    defendants.  I'm at my residence in River

4    Ridge, Louisiana, and we agree.

5    MR. LEWIS:

6        Jonathan Lewis on behalf of the

7    defendants.  I am currently at the Davillier

8    Law Group in New Orleans, Louisiana, and we

9    agree.

10   THE REPORTER:

11       Okay, sir, do you agree to have your

12   deposition taken via Zoom?

13   THE WITNESS:

14       Yes.  John Davillier in New Orleans,

15   and I agree.

16           JOHN DAVILLIER,

17   777 Behrman Highway, Gretna, Louisiana 70056, after

18   having been duly sworn, was examined and did testify

19   as follows:

20   MR. HAYES:

21       Good morning, Mr. Davillier.

22   THE WITNESS:

23       Good morning.

24   MR. HAYES:

25       You heard me introduce myself off the

```
 1              record, but my name is Preston Hayes, and I
 2              represent the plaintiffs and the opt-in
 3              plaintiffs in this matter.
 4   EXAMINATION BY MR. HAYES:
 5   Q    Have you ever given a deposition before?
 6   A    Yes.
 7   Q    Okay.  So I won't bore you with all of the rules
 8        and regulations.  I'm sure you're familiar with
 9        that and your attorney has told you.  But what I
10        will tell you is sometimes I ask a poor
11        question.  It happens, and it's going to happen
12        throughout the day I would imagine at some
13        point.  If I do ask a question that you don't
14        understand or you think it's poorly worded, I
15        want you to stop me and ask me to rephrase that
16        question; okay?
17   A    Okay.
18   Q    But I want to have an agreement with you that if
19        I ask a question and you give me an answer, it's
20        because you felt you understood what I was
21        asking; is that fair?
22   A    Sure.
23   Q    Okay.  Let's start off by having you state your
24        name and your business address for the record.
25   A    John Davillier; 777 Behrman Highway, Gretna,
```

```
 1        Louisiana 70056.
 2   Q    Okay.  And I understand that you are a member of
 3        HD and Associates, LLC; is that correct?
 4   A    Correct.
 5   Q    Okay.  Tell me, if you will, what -- is there
 6        any other job title that you hold within HD and
 7        Associates, LLC?  And just for the record, I'm
 8        going to refer to HD and Associates, LLC, as
 9        just "HD" for ease of reference; is that okay?
10   A    Sure.
11   Q    So if you would, could you tell us what job
12        title, if any, you hold with HD?
13   A    You could say manager.
14   Q    Okay.  In the past three years, going back to
15        2017, have there been any other managers with
16        HD?
17   A    Yes.
18   Q    Okay.  And could you give me their names,
19        please?
20   A    Stephen Becnel.
21   Q    Is he the only one?
22   A    With the title "Manager," yes.
23   Q    Okay.  And there haven't been any other managers
24        in the past three years?
25   A    Not -- no; not -- it would depend on how you
```

```
 1         would define manager.
 2   Q     Well, you know, I don't want to give it any
 3         definition, per se.  I'm just curious.  You
 4         know, you're the sole member, as I understand,
 5         of HD.  I'm just trying to find out who you
 6         would classify as managers within the company
 7         within the last three years.
 8   A     We had lead technicians who would be, but they
 9         would not be considered managers, so --
10   Q     Okay.
11   A     But they -- they did have -- they did have
12         certain other responsibilities --
13   Q     Okay.
14   A     -- that were not directly technicians.
15   Q     Let's talk about -- well, let me back up.  When
16         was the inception date of HD, if you recall?
17   A     It was about June of 2010.
18   Q     Okay.  Have your job title or job duties changed
19         since the inception of the company?
20   A     Not really.  I mean, I'm the -- I'm a managing
21         member, and I manage the projects that the
22         company has assigned to them.
23   Q     Okay.  Have there been any other managing
24         members since the inception of HD?
25   A     No.
```

```
1   Q    Okay.  So tell us if you could, what are your
2        job duties on a daily basis?
3   A    Whatever projects we have assigned to the
4        company, I manage those projects and make sure
5        that we have people in place to help manage the
6        process.  So there are various aspects to
7        different projects.  So for -- on the technician
8        side, our overall manager is Stephen Becnel,
9        so -- but we have other people that assist with
10       the day-to-day tasks, and that's done based on
11       what's required at the time.
12  Q    But is it just you that has operational control
13       over HD?
14  A    No.
15  Q    Okay.  Are you one of the people who has
16       operational control over HD?
17  A    Yes.
18  Q    Okay.  Who besides you maintains operational
19       control over HD?
20  A    Stephen Becnel.  Carolyn Ballard (ph) would be
21       the dispatch person.
22  Q    Anyone else that you can think of?
23  A    Well, the technician supervisors have some
24       operational control, depending on the task.
25  Q    Okay.  Who decides within HD how it is the
```

11

```
1        technicians are paid?

2   A    Well, since inception, we sort of had a

3        discussion among management, and we decided that

4        that structure was common in the industry and it

5        would be the best approach for us to operate

6        under.

7   Q    Were you on that management team that made the

8        ultimate decision as to how the technicians were

9        going to be paid?

10  A    Yes.

11  Q    Okay.  Who else besides yourself comprised the

12       management team that made that decision?

13  A    Myself.  I had some initial discussions.

14       Primarily, it was me that made that initial

15       decision in terms of how it was set up and then

16       discussed it with management.

17  Q    Okay.  Who else?  When you say management, are

18       you referring to Stephen Becnel?

19  A    And Carolyn Ballard.

20  Q    Okay.  Is Stephen Becnel still with the company?

21  A    Yes.

22  Q    Okay.  And I think you said Carolyn Ballard.  Is

23       she still with the company as well?

24  A    She is, but she really handles dispatch, not

25       really technicians.
```

```
1    Q    Okay.  Does she have a job title?
2    A    She's a dispatch manager.
3    Q    Okay.  Okay.  What would her job duties include
4         on a given day?
5    A    She coordinates with dispatch to enter the
6         information into the Cox system as far as
7         equipment, things like that.
8    Q    Okay.  Who would be responsible for providing
9         the HD technicians with their routes in a given
10        day?
11   A    Their routes are assigned by the Cox system.  In
12        the morning and throughout the day, the routes
13        are generated or jobs are changed out throughout
14        the day by the Cox system.
15   Q    Okay.  Does the -- does the dispatcher have any
16        control to alter those routes to reassign them
17        to different technicians different from who
18        they're originally assigned to in the day?
19             MR. LEWIS:
20                  Objection to the form of the question.
21                  (To the witness.)  You can answer.
22   MR. HAYES:
23   A    Can you repeat that for me?
24   Q    Sure.  I'm trying to find out that -- I know you
25        said that the Cox system initially provides the
```

```
1          routes for the technicians in a given day.  What

2          I'm trying to find out is, does the HD

3          dispatcher have the ability to alter those

4          routes to reassign them to other technicians

5          throughout the day?

6     A    In a limited scope, yes.

7     Q    Well, when you say "in a limited scope," can you

8          tell me what you mean by that?

9     A    In general, Cox wants to have the system assign

10         the routes, so it's all pretty much automated.

11         So you know, in general, the process is that the

12         automated system handles the route

13         reassignments.

14             In a limited capacity means, if you have an

15         emergency situation or somebody has to leave or

16         something like that and they can't finish their

17         routes for that day, then that's when the

18         dispatchers will typically try to reassign work.

19    Q    And that would be an HD dispatcher?

20    A    Not always.  A lot of times, that is also done

21         automatically by the Cox system.

22    Q    Okay.  Well, could a -- could an HD technician

23         call the HD dispatcher and ask for a route to be

24         reassigned?

25             MR. LEWIS:
```

```
 1              Objection to the form of the question.
 2         You can ask him to rephrase it.
 3   MR. HAYES:
 4   A    Can you rephrase that?  I guess I'm not really
 5        clear on what --
 6              MR. HAYES:
 7                   And Jonathan, you can't -- I mean, if
 8              he doesn't understand it, that's fine, but
 9              you can't instruct him how to answer the
10              questions.
11              MR. LEWIS:
12                   I'm sorry.
13   MR. HAYES:
14   Q    My question to you is that, if a technician fell
15        behind on his job route on a given day, could
16        the HD technician call the HD dispatcher and ask
17        any portion of his route to be reassigned?
18   A    I assume that they could; yes.
19   Q    Okay.  Well, let me ask you, what does Carolyn
20        do if Cox handles all the dispatches?
21   A    Like I said, we still have to in the system
22        enter information to assign equipment and things
23        like that.  So the system is tied together.
24        Even though the title is "Dispatch," it doesn't
25        mean route assignment.  It more means that the
```

```
 1            primary purpose of that job is getting the
 2            proper equipment on the proper customer's
 3            account and addressing issues that occur as a
 4            result of that in order to have the technician,
 5            you know, get the job done at whatever location
 6            he's at.
 7       Q    Would you consider HD to --
 8       A    (The witness begins to speak.)
 9       Q    I'm sorry.  Did I cut you off?  If I did, let me
10            know.
11       A    You're fine.
12       Q    But if I do that during the deposition,
13            sometimes if you pause, I think you're finished
14            and I'll start with my next question.  If I do
15            that, please stop me, and I'll let you finish
16            your answer; okay?
17       A    Okay.
18       Q    Okay.  Would you consider HD to essentially be a
19            will staff company just providing technicians to
20            Cox?
21       A    I don't know what you mean by a "will-staffed
22            company."
23       Q    Are you familiar with companies that are will
24            staff companies where they provide workers to
25            different projects; are you not?
```

```
 1   A    Not -- not by that term; no.
 2   Q    Okay.  Well, in your opinion, does HD do
 3        anything other than simply provide technicians
 4        to Cox to complete Cox projects?
 5   A    What time frame are you talking about?
 6   Q    Well, let's say from 2016.
 7   A    We've had other projects, not only Cox.  So --
 8   Q    Okay.  Well, okay, so let me -- let's back up,
 9        then.  So other than having Cox as a customer,
10        HD has had other entities that have been their
11        customers over the years?
12   A    Yes.
13   Q    Okay.  And what are those entities?
14   A    When we first started, I didn't have the Cox
15        project, so we did some work for Sprint and some
16        other places.
17   Q    Okay.  At some point in time, did HD begin doing
18        work exclusively for Cox?
19   A    The majority for Cox I would say; yes.
20   Q    Okay.  Is your business arrangement with those
21        other entities any different than it is for Cox?
22   A    I'm not sure what you mean.
23   Q    Well, let me see if I can -- let's talk about
24        Cox for a minute.  In your opinion, does HD do
25        anything for Cox other than provide technicians
```

1           to service its projects?

2    A      No.

3    Q      Okay.  But nevertheless, the paychecks that the

4           technicians receive, those come from HD;

5           correct?

6    A      Correct.

7    Q      Okay.  All right.  I want to back up.  I want to

8           ask you, since 2017, January 1st, 2017, -- let's

9           start with that year -- how many employees does

10          HD have?

11   A      I'm sorry, but I don't know that information

12          offhand from that time frame.

13   Q      Is it less than ten?

14   A      I don't really recall.  Probably so, but I don't

15          recall for sure.

16   Q      Would it be less than 20?

17   A      I'm not sure.

18   Q      Okay.  And I understand that in 2017 and even

19          through the present time, HD treats its

20          technicians as independent contractors; is that

21          correct?

22   A      Yes.

23   Q      Okay.  Has that changed from January 1st, 2017,

24          through the present?

25   A      No.

18

```
 1   Q    Okay.  In the year 2020, how many employees does
 2        HD have?
 3   A    Employees versus independent contractors?  Is
 4        that what you're trying to ask?
 5   Q    Yes, sir.  I'm just -- right now -- I'm going to
 6        get to the independent contractor question, but
 7        right now I'm trying to figure out, in 2020, how
 8        many employees does HD have?
 9   A    Seven.
10   Q    What about 2019?  How many employees did they
11        have then?  Or did it change?  And that was a
12        poorly-worded question.  Let me re-ask it; okay?
13             Did the number of employees from 2020, which
14        you said was seven, change in 2019, or did it
15        stay set?
16   A    I think it's pretty close to the same.
17   Q    Okay.  So when 2020 started, you had seven
18        employees.  Can you tell me who they are?
19   A    Carolyn Ballard, Jody Wallace, Teshan Flowers,
20        Keshia -- I can't remember her last name -- and
21        Corinne Scott.
22   Q    Would that be it?
23   A    Yes.  And well, Cedrika Banks (ph) also.
24   Q    Cedrika Banks?
25   A    Yes.
```

19

```
 1   Q    I'm going to ask you quickly what each of them
 2        do.  What does Jody do?  What's her job title?
 3   A    She's a dispatcher.
 4   Q    Dispatcher.  What about -- did you say Keshia?
 5   A    Teshan Flowers.
 6   Q    Teshan Flowers.  What does he do?
 7   A    She is a dispatcher.
 8   Q    Okay.
 9   A    Well, she was a dispatcher.  She's now
10        warehouse -- she works in the warehouse.
11   Q    Okay.  And you said Corinne Scott (ph).  What
12        does she do?
13   A    Dispatcher.
14   Q    Okay.  And you gave me another name that started
15        with a "K."  Was it Keshia?
16   A    Keshia.  Yes.
17   Q    Keshia.
18   A    She's a dispatcher.
19   Q    A dispatcher.
20            And that last name that you gave me, is it
21        Cegrina?
22   A    Cedrika, C-e-d-r-i--
23   Q    I'm sorry.  My handwriting's terrible.  Cedrika.
24        Okay.  What does Cedrika do?
25   A    She worked in the warehouse as well.
```

Q Is she still an employee?

A Yes. And Dominique Bush (ph) is the other person who is a dispatcher as well.

Q Now, all these people you named, are they salaried employees?

A No.

Q Okay. So they are employees, though; correct?

A Yes.

Q Okay. Are they paid on an hourly basis?

A Oh, I'm sorry. I didn't get your question before.

Q Sure. I said --

A So -- go ahead.

Q Let me back up for you. I asked you if those people who you just identified are employees of HD.

A Correct.

Q Okay. And then I was trying to find out, you know, how HD pays them. Do they pay them on an hourly basis?

A They're -- they're salaried.

Q Salary. Okay. Okay.

And you believe in 2019, these would be roughly the same employees you would have had working for HD?

```
 1   A    Yes.
 2   Q    Okay.  And how many -- how many people who you
 3        classify as independent contractor technicians
 4        do you have in 2020?
 5   A    It's probably about 23.  Well, no.  It's
 6        probably about twenty -- 26, 27.
 7   Q    Does that -- does that number fluctuate
 8        throughout the year?
 9   A    Somewhat; yes.
10   Q    Could that number have been higher at the
11        beginning of 2020?  I know we went through COVID
12        or we're still going through COVID.  You know,
13        did that number change as a result of the
14        pandemic?
15   A    A little bit; yes.  But I don't know -- to be
16        honest, I don't know the exact numbers off the
17        top of my head of how many people were at each
18        different time.  I would have to refer to
19        something.
20   Q    Sure.  Okay.  Fair enough.
21             Did HD apply for a PPP loan?
22   A    Yes.
23   Q    Do you remember -- well, let me ask you this.
24        Are you the one who would have applied for the
25        PPP loan on behalf of HD?
```

```
 1   A    Yes.
 2   Q    Okay.  Do you remember how many employees that
 3        you represented worked for HD on your PPP loan?
 4   A    No; I don't.
 5   Q    Would I be wrong if I were to tell you that it
 6        was 46?
 7   A    I'm not sure.
 8   Q    Okay.  If the number of employees that you
 9        represented was 46, can you tell me what the
10        basis of that would have been?
11   A    I mean, I would have to look at the -- I would
12        have to look at the records, to be honest.  The
13        numbers I'm giving you are based on my kind of
14        recent general recollection of payroll and the
15        number of routes we have right now.
16   Q    Okay.  So you wouldn't --
17   A    But in general -- in general, it would include
18        the types of people that I've described -- in
19        general.
20   Q    But you wouldn't have -- you wouldn't have
21        counted the independent contractor technicians
22        as employees when you applied for your PPP loan;
23        would you?
24             MR. LEWIS:
25                  Object to the form of the question.
```

1    MR. HAYES:

2    Q    You can answer.

3    A    I applied for the PPP loan based on the

4         guidelines.

5    Q    Okay.  Well, I guess what I'm trying to get down

6         to, Mr. Davillier, is this.  You told me that

7         you have seven employees in 2020, and your PPP

8         loan represents that you have 46.  So I'm trying

9         to find out if you included your technicians as

10        employees when you applied for the PPP loan?

11            MR. LEWIS:

12                Object to the form of the question.

13   MR. HAYES:

14   A    I would have to look at the regulations.  I

15        mean, I -- I filled out the PPP loan based on

16        the guidelines of the document, so that's all I

17        can really tell you.  I don't know what else to

18        say.

19   Q    Well, I guess I'm trying to figure out how you

20        got to the number 46.  Who did you include?

21        Irrespective of the guidelines, I'm trying to

22        figure out who you included in your PPP loan to

23        get to the number 46 versus the seven employees

24        you actually have.

25            MR. LEWIS:

```
 1                  Objection.  Asked and answered.
 2            MR. HAYES:
 3                  He hasn't answered that question.
 4   MR. HAYES:
 5   A    I included everyone that fit the guidelines of
 6        the PPP loan.
 7   Q    Did anyone help you fill out the PPP paperwork?
 8   A    I completed it myself.
 9   Q    Okay.  Did you seek assistance from anyone else?
10   A    I don't recall.  I mean, I may have discussed
11        the general guidelines, but I don't recall
12        specifically.
13   Q    Well, but you still haven't answered my
14        question, which is I want to know who the 46
15        people are that you included as employees for
16        your PPP loan.
17            MR. LEWIS:
18                  Objection.  Preston, I have to just
19            disagree.  This is -- the PPP would be
20            outside of the class period and anything
21            related to this case.
22            MR. HAYES:
23                  No.
24            MR. LEWIS:
25                  So if you stop there, I'm going to into
```

1          the relevance of it.

2          MR. HAYES:

3               Well, the relevance of it is he's

4          maintained in this proceeding that all of

5          the technicians are independent contractors.

6          And it appears to me, and that's what I'm

7          trying to get to the bottom of, has he

8          represented to the Federal Government that

9          those people are actually employees to gain

10         PPP funds.  That's why this is very

11         relevant.  And I want to know who those 46

12         people are that he told the Federal

13         Government were employees.

14  MR. HAYES:

15  A   Again, I completed the PPP loan based on the

16      guidelines and submitted the information to the

17      bank, and I've given the bank everything in

18      terms of the information required that they

19      requested, and I've answered all of their

20      questions.

21  Q   Well, I'm not asking you about the guidelines.

22      You filled out the PPP paperwork, and you came

23      up with the number 46 as being the number of

24      employees, and all I'm asking you is who those

25      46 are.

```
 1   A     I'm just telling you that that is the PPP loan.
 2         I don't see how it's relevant to this, these
 3         proceedings.
 4   Q     Well, it is, sir, and I'm asking you to answer
 5         my question, who are the 46 people --
 6   A     I don't know that information offhand.
 7   Q     -- that you told the Federal Government were
 8         employees?
 9   A     I'm sorry, sir, but I just don't have that
10         information in front of me, so I can't really
11         even answer that question if I wanted to.
12   Q     Okay.  Well, you would agree with me that the
13         number seven you gave me is a far different
14         number than 46; correct?
15   A     I agree in general terms that seven is a
16         different number from 46; yes.
17   Q     Okay.  But as you sit here today, you don't know
18         who those other 39 people are that you told the
19         Federal Government were your employees?
20              MR. LEWIS:
21                   Objection.  Calls for speculation.
22   MR. HAYES:
23   Q     I'm not asking you to speculate.  If you don't
24         know, you don't know.  But I'm asking you, and
25         you filled that paperwork out a couple of months
```

```
 1         ago.  My question to you is, as you sit here
 2         today, you don't know who those other 39 people
 3         are that you told the Federal Government were
 4         your employees?
 5    A    I don't agree with your question.  I don't
 6         understand your question, and I don't agree with
 7         the basis of the question because you're making
 8         assumptions there, and I can't really address
 9         that.
10    Q    Well, what -- what assumptions do you think I'm
11         making?
12    A    I don't know.  They're your assumptions.  I
13         can't answer what you were thinking.
14    Q    Well, my question to you is, you have 46 people
15         listed as employees; do you agree with that?
16              MR. LEWIS:
17                   Objection.  Mischaracterizes his
18              earlier testimony, and it's been asked and
19              he answered it.
20              MR. HAYES:
21                   He's not.  He's not answering my
22              question.  And if we need to get the
23              Magistrate involved, we will, because I want
24              to get to the bottom of this.  This is
25              highly relevant.  He's maintained in these
```

1              proceedings they're all independent

2              contractors, but yet, it does appear that

3              maybe he represented that they were

4              employees to the Federal Government, so I

5              want to know which one is it.

6  MR. HAYES:

7  Q    Why did you represent that there are 40-

8       something employees of your company when you've

9       told me earlier there are seven?  So my question

10      to you is, did you include the actual

11      technicians as employees when you filled out the

12      PPP loan?

13 A    My answer is that the technicians for HD and

14      Associates are independent contractors.

15 Q    And if you would have represented to the Federal

16      Government that they're employees, that would

17      have been false; correct?

18            MR. LEWIS:

19                Objection.

20 MR. HAYES:

21 Q    You can answer my question.

22 A    I followed the guidelines and communicated with

23      my bank regarding the PPP guidelines, and that's

24      what I did.

25            MR. HAYES:

```
 1              I'm going to object to the
 2              responsiveness.  And if we have to get the
 3              Magistrate on the phone, that's fine.  We
 4              can do that.
 5   MR. HAYES:
 6   Q    But my question to you, sir, is, if you
 7        represented in your PPP paperwork that the
 8        technicians were your employees, that would have
 9        been false; correct?
10   A    I do not agree with you.
11   Q    Okay.  So you think they are your employees?
12            MR. LEWIS:
13                Objection.
14   A    I disagree with your statement that something I
15        submitted was false.  That's what I'm saying.
16   MR. HAYES:
17   Q    Okay.  So what you're saying is, it would not
18        have been false if you told the Federal
19        Government that your technicians were your
20        employees?
21   A    That is not what I'm saying, sir.
22   Q    Well, it's an either/or question, sir.  What I'm
23        asking you, very, very plain, it's a yes or no
24        question, if you represented to the Federal
25        Government through your PPP paperwork that the
```

```
 1        technicians that work for HD were independent
 2        contractors, that would have been false?
 3             MR. LEWIS:
 4                  Objection.  Mischaracterizes the
 5             earlier testimony.
 6             MR. ZIMMER:
 7                  Well, Preston, we probably do need to
 8             go ahead and get the Magistrate on.  I
 9             think --
10             MR. HAYES:
11                  Yeah, yeah, because this -- yeah, yeah.
12             We're just talking -- we're talking in
13             circles here.
14             MR. ZIMMER:
15                  Yeah.  You're asking him a highly
16             detailed legal question about the definition
17             of employee, and that's a federal
18             application as opposed to what he classifies
19             employees in his own use.  So we should
20             definitely get the Magistrate on --
21             MR. HAYES:
22                  Yeah, yeah.
23             MR. ZIMMER:
24             -- because this is way, way --
25             MR. HAYES:
```

```
 1              Yeah, yeah, yeah; I want to do that.  I
 2       mean, I don't want to argue in front of him
 3       because, you know, I think you're telling
 4       him how to answer.
 5       MR. ZIMMER:
 6              Yeah.  Shut down -- yeah.  Shut down on
 7       the deposition right now.  Let's shut it
 8       down, and we'll get back on whenever you've
 9       got the Magistrate ready to go.
10       MR. HAYES:
11              Okay.  Let me -- I'll go ahead and mute
12       it and stop it, and then I'll work on
13       getting the Magistrate on the line.  Do you
14       want me to call you directly, Charlie?
15       MR. ZIMMER:
16              Yeah.  We'll figure out how to get the
17       Magistrate set up or whatever.
18       MR. HAYES:
19              What's your -- what's your phone
20       number, your direct line?
21       MR. ZIMMER:
22              504 -- 504-729-8082.
23       MR. HAYES:
24              8082.  All right, let me get off, and
25       I'm going to call you first, and then you
```

```
 1              and I can -- can call the Magistrate
 2              jointly.
 3         MR. ZIMMER:
 4              Sounds good.
 5                   (Off the record.)
 6         MR. HAYES:
 7              Madame Court Reporter, are we back on
 8         the record?
 9         THE REPORTER:
10              Yes; we're ready.
11         MR. HAYES:
12              Thank you.
13  MR. HAYES:
14  Q    All right, Mr. Davillier, when we left off, I
15       was asking you some questions about the PPP
16       loan.  In the number of individuals, whether or
17       not you want to call it independent contractors
18       or employees, did you include the technicians in
19       the number of individuals on your PPP loan?
20  A    Yes.
21  Q    Okay.  And did you give any of the PPP money
22       that you received to technicians?
23  A    Yes.
24  Q    Okay.  Did you understand that you were
25       representing to the Federal Government that
```

```
 1            those people were employees of HD?
 2                 MR. LEWIS:
 3                      Objection to the form of the question.
 4   MR. HAYES:
 5   A    That was not my understanding.
 6   Q    Okay.  So it was your -- it was your
 7        understanding that you could claim independent
 8        contractors in your PPP loan information?
 9                 MR. LEWIS:
10                      Objection to the form of the question.
11   MR. HAYES:
12   A    My understanding is that everything I submitted
13        in my PPP application is consistent with the
14        guidelines.
15                 MR. HAYES:
16                      That wasn't my question to you, sir,
17        and I'll object to the responsiveness.
18   MR. HAYES:
19   Q    My question to you is, was it your understanding
20        that you could claim independent contractors in
21        your submission for your PPP loan?
22                 MR. LEWIS:
23                      Objection again.
24   MR. HAYES:
25   A    I submitted the loan based on my interpretation
```

```
 1          of the guidelines and what was required, and
 2          I've already told you that I've included the
 3          technicians in that submission.
 4     Q    Okay.  How did you pay them when the PPP money
 5          came in?
 6     A    I don't know that offhand.  It was, you know, --
 7          I would have to refer to my documents, but I
 8          paid them weekly anyway, so --
 9     Q    You don't know how you came up with your
10          calculations?  Go ahead.  I didn't mean to cut
11          you off.
12     A    I'm not sure I understand your -- your question.
13     Q    Sure.  My question is, how did you determine how
14          much you were going to give each technician from
15          the PPP loan?
16     A    The PPP loan is set up to cover overall
17          expenses.  So part of that is technician pay, so
18          I used it to -- to pay the technicians as well
19          as the employees.  But that's -- I don't
20          understand how that's relevant to the current
21          time frame that we're talking about.
22     Q    Well, well, that's not -- well, I'm not going to
23          explain to you the rules of depositions and
24          what's allowable and what's not.
25     A    Okay.
```

```
 1   Q    But my question to you is, what formula did you
 2        utilize to determine how much money each
 3        technician got from the PPP loan?
 4            MR. LEWIS:
 5               Objection.
 6   MR. HAYES:
 7   A    It was not that type of calculation, so I
 8        don't -- I can't tell you a specific formula
 9        that I used for each person.  I don't really
10        know that right now off the top of my head.
11   Q    Would HD maintain documentation as to the amount
12        of money from the PPP loan that was paid to each
13        technician?
14   A    Not in that specific format; no.
15   Q    Would just the amount of money paid to them be
16        documented somewhere?
17   A    The expenses for the company are documented;
18        yes.
19   Q    But if we looked at what was paid to the
20        technicians, would HD maintain documents which
21        shows how much of the PPP loan was paid to
22        technicians?
23   A    I mean, we could figure that out.  I don't know
24        that right now.
25   Q    Okay.  The technicians that you paid the PPP
```

```
 1        funds to, are those technicians any different
 2        than the ones that we have in our current
 3        litigation?
 4             MR. LEWIS:
 5                  Objection.
 6   MR. HAYES:
 7   A    They're current technicians with the company.
 8        The technicians in the litigation are not
 9        current technicians.
10   Q    Sure.  But I guess my question to you --
11   A    So they're different.
12   Q    Are their job duties today any different than
13        the job duties of the technicians who worked for
14        you that are part of this lawsuit?
15   A    No.
16   Q    Okay.  And I understand that you made your
17        application for a PPP loan to Hancock Whitney
18        Bank?
19   A    Yes.
20   Q    Do you still have the documentation that you
21        submitted to Hancock Whitney Bank?
22   A    I'm sure the bank has a copy.  I'm sure I do as
23        well.
24   Q    Well, that's my question.  Before I can go and
25        subpoena the bank records, I first have to ask
```

```
1          you if HD maintains the records that were
2          submitted to the bank for the PPP loan.
3    A     I should have a copy; yeah.
4    Q     Okay.  I would ask you to preserve those,
5          because I will make a formal -- a formal request
6          for those later; okay?
7    A     Okay.
8    Q     Okay.  Would you agree with me that the
9          technicians that are a part of this lawsuit were
10         an integral part of your business at HD?
11   A     Each technician?  They were part of the company
12         operations; right?  So yeah.
13   Q     Well, let me ask you this.  What services does
14         HD provide to its customers in the last three
15         years?
16   A     Telecommunications services.
17   Q     And it's my understanding -- I'm sorry.  Go
18         ahead.
19   A     For Cox, it would be telecommunications and
20         installs for residential customers.
21   Q     Okay.  And it's my understanding -- and I want
22         you to correct me if I'm wrong -- that one
23         hundred percent of that work that you provide
24         are provided by the technicians; correct?
25   A     Yes.
```

```
 1   Q    Okay.  And there are no services that HD
 2        provides that -- strike that.
 3             In the last three years, all of the income
 4        derived by HD is a result of work performed by
 5        the technicians in this lawsuit; correct?
 6   A    No.
 7             MR. LEWIS:
 8                  Object.
 9   MR. HAYES:
10   A    That's not correct.
11   Q    Well, that was a poor question, probably.
12             One hundred percent of the income derived by
13        HD is a result of work performed by technicians?
14   A    No.
15   Q    Okay.  Well, tell me -- tell me what income HD
16        derived that is not as a result of technician
17        labor.
18   A    Like I said, we have different projects at
19        different times, so not all of those projects
20        involve residential cable installation.  So I've
21        had -- over this period of time, I've had other
22        projects with the Recovery School District that
23        was not -- that did not involve cable
24        installation.
25   Q    Was any of that work performed by the
```

```
 1         technicians?
 2    A    No.
 3    Q    Okay.  Who would have performed that work?
 4    A    The person working on that project.
 5    Q    Well, I know, but I mean, what was their title
 6         with HD?
 7    A    I mean, they were -- they were -- we're not
 8         really big on titles, per se, in term of a
 9         formal organizational structure, but I guess he
10         would have been a construction -- construction
11         auditor.
12    Q    Okay.  And he's the sole person who would have
13         performed the services that you referenced just
14         a moment ago?
15    A    Yes.
16    Q    Okay.  So it would have been one individual?
17    A    For that project, yes.
18    Q    Okay.  And when was that project performed?
19    A    I don't remember the dates specifically.
20    Q    Do you remember the year?
21    A    It would have been in the period of the time
22         we're talking about.
23    Q    Okay.  How many other individuals would have
24         performed work that had HD derived income from
25         other than the one individual that you've just
```

| | | |
|---|---|---|
| 1 | | identified for us as a construction auditor? |
| 2 | A | Myself, if I had a different project come up. |
| 3 | | But I'm not -- you know, it's really difficult |
| 4 | | to answer that question without having that |
| 5 | | information in front of me. |
| 6 | Q | Well, let me ask it -- |
| 7 | A | So -- |
| 8 | Q | I'm sorry.  Go ahead. |
| 9 | A | Yeah.  I just don't -- I don't track things like |
| 10 | | that.  You know, projects come and go, and |
| 11 | | sometimes we have an opportunity and we -- we |
| 12 | | dedicate whatever resources we can get to that |
| 13 | | project. |
| 14 | | But sometimes projects vary durations, but |
| 15 | | we do other things in general.  We -- Cox is not |
| 16 | | the only thing that we do. |
| 17 | Q | Would you agree with me, though, that the vast |
| 18 | | majority of the revenue received by HD is as a |
| 19 | | result of technician labor? |
| 20 | A | Well, I mean, I don't see how you discount |
| 21 | | dispatch labor, but a good percentage of our |
| 22 | | work involves the Cox project. |
| 23 | Q | Okay.  Well, -- well, the dispatchers, they |
| 24 | | don't generate the income; do they? |
| 25 | A | Well, if nobody puts that equipment on the |

```
 1        account, then there is no income.  So they serve
 2        an important role as well.  That's all I'm
 3        really trying to say.  That's all.
 4   Q    And I guess -- and I guess the question I'm
 5        getting at is, you don't charge Cox for dispatch
 6        labor; do you?
 7   A    I -- the contract is not set up based on who's
 8        doing what.  It's not really broken down like
 9        that.
10   Q    Well, isn't a field service agreement set up to
11        pay for jobs completed by technicians in the
12        field?
13   A    Yes, but part of completing a job is the
14        technician physically putting the equipment on
15        the account and the dispatcher electronically
16        making sure that everything's correct.  That's
17        all I'm saying is those two pieces kind of work
18        together.  That's all.
19   Q    Does Cox reimburse you for any payments made to
20        dispatchers?
21   A    No.
22   Q    Okay.  Without technician labor, would HD cease
23        to exist?
24   A    No.
25   Q    Okay.  So HD could still perform all of its job
```

```
1            duties and turn a profit without technicians in
2            the field; is that what you're saying?
3    A       You asked me would HD cease to exist as a
4            company?
5    Q       Right.
6    A       Correct?
7    Q       Correct.
8    A       So my answer is no.
9    Q       And my question to you is, would HD be able to
10           fulfill its obligations under the contract with
11           Cox without technician labor in the field?
12   A       No.
13   Q       Are the technicians -- and I want to focus on
14           the ones that are part of our lawsuit.  Were the
15           technicians that are part of our lawsuit hired
16           for a specific period of time?
17   A       No.
18   Q       Okay.  Their tenure -- and I'll refrain from
19           using the word "employment," because I'm sure
20           your lawyer would object to that, but would --
21           would their work with HD be indefinite in
22           nature?
23   A       No.  It would really kind of depend on the
24           demand and the requirements that Cox has in
25           terms of the number of technicians they need.
```

1  Q   Sure.  But their -- but their contract with HD
2      wasn't for a term; correct?
3  A   Not specifically, from what I -- I mean, I would
4      have to look at the document.
5  Q   So if -- if Cox had a continuing demand for
6      technician labor and you had a technician that
7      did a good job, he would continue to receive
8      work; is that correct?
9  A   Typically, yeah.
10 Q   And that would be --
11 A   As long as the work is there and they met the
12     requirements and standards set forth by Cox;
13     yeah.
14 Q   You would -- he would continue his work on
15     behalf of HD on an ongoing basis; correct?
16 A   If the demand was there from Cox and he met the
17     Cox requirements, yes.
18 Q   Okay.  I want to talk a little bit about the
19     engagement practices of HD when it came to
20     engaging employees or independent contractors,
21     as I know you would call them.  Tell me how it
22     is that HD engages new contractors, new
23     technicians.
24 A   That's pretty general.
25 Q   Yeah.  Let me -- let me see if I can clean that

```
 1         up for you.  Does HD do any advertising to

 2         solicit new technicians to apply with your

 3         company?

 4              MR. LEWIS:

 5                   Objection.  Calls for speculation.

 6    MR. HAYES:

 7    Q    You can answer the question.

 8    A    In general,-- in general, no, but I would --

 9         generally, no.  But you know, if there was a

10         need to do that, then certainly we would look at

11         that option.

12    Q    Has that been done in the past?

13    A    Not to my -- honestly, I can't really recall

14         directly.  Maybe when we first started out, it's

15         possible.

16    Q    I guess what I'm trying to find out, Mr.

17         Davillier, is how is it that new technicians

18         come to HD?

19    A    Typically, it's either referrals -- you know, a

20         lot of it is referrals from existing

21         technicians.

22    Q    Okay.  So does HD only engage experienced

23         technicians, or do y'all sometimes get people

24         who want to be technicians and it's their first

25         job in this particular field?
```

1          MR. LEWIS:

2                 Objection to the form of the question.

3    MR. HAYES:

4    A    Can you repeat that?  I'm sorry.

5    Q    Yeah.  I'm trying to find out if HD only engages

6         technicians that have previous experience.

7    A    In general, previous -- I mean, they have to

8         have some type of technical aptitude.

9    Q    Okay.  Let me -- let me -- yeah; let me try to

10        rephrase that.  Does HD only engage technicians

11        that have previous experience as cable

12        technicians?

13   A    The majority, yes, but there are some

14        exceptions.

15   Q    Okay.  So HD on occasion would engage

16        technicians that had never had experience as

17        technicians before applying with HD; is that

18        fair?

19   A    Typically, -- typically, it's not -- maybe not

20        technicians in household situations, but they

21        may have other technical experience.

22   Q    Okay.  Has HD ever engaged a technician that

23        doesn't have that?

24   A    A few times.  Not very many, but a couple of

25        times.

1    Q    Okay.

2    A    It's a smaller number.

3    Q    Right.  And I can appreciate that.  I guess the

4         question I want to really get to is, when you

5         have someone who doesn't have any experience and

6         they're engaged as a technician on behalf of HD,

7         what type of training are they provided before

8         they're allowed to go out in the field and

9         service Cox contracts?

10   A    They -- there's typically some online training

11        and some in-person training, and they're

12        typically shadowed by one of the lead -- the

13        supervising technicians to kind of assess

14        their -- their abilities, etcetera, at that

15        point.

16   Q    How long does that process typically take?

17   A    It varies by individual.  So you know, it could

18        be four weeks.  It could be longer.

19   Q    You referenced --

20   A    But typically four weeks.

21   Q    Okay.  You referenced some online training

22        materials, I think.  Could you tell me a little

23        bit about that?

24   A    Like, some of that is just -- I say online, but

25        it's just electronically, so some of the

```
 1        information that Cox provides in terms of
 2        standards.  So they've got to -- they've got to
 3        learn the Cox standards, because that's kind
 4        of -- the Cox standard is kind of what we work
 5        towards or work by.  So that information is --
 6        is communicated to the technicians --
 7   Q    So --
 8   A    -- and then, you know --
 9   Q    So HD requires its technicians to adhere to the
10        Cox standards; correct?
11   A    Correct.
12   Q    Okay.  Are they allowed to complete jobs as they
13        see fit, or are they always expected to adhere
14        to the Cox standards?
15   A    Well, the Cox standard defines what is expected
16        to be done.  It doesn't define how it's done.
17        The how it's done is -- that has to be
18        determined by the technician, because everybody
19        has their own way of working and their own -- so
20        when I talk about standards, I'm talking about
21        technical standards.
22             So if the dB levels have to be at a certain
23        place, the connectors have to be put on a
24        certain way to make sure that there's no impact
25        to the Cox network.  So when I talk about
```

48

```
1         standards, I'm really talking about technical
2         standards.  How a technician decides to run a
3         wire or troubleshoot, that's an individual --
4         individual technician skill that varies by
5         technician.  So the standard has to be met.  The
6         process is up to the technician.
7    Q    Are the online materials that you refer to, are
8         they available to you now?
9    A    No.  It's just PDF documents.
10   Q    Okay.  So if I were to --
11   A    I think most of it is in the contract, the FSA
12        agreement, I think.  I'm not sure, but there's
13        PDF documents.  And occasionally --
14   Q    But if I were to -- go ahead.  I'm sorry.
15   A    Go ahead.
16   Q    I just wanted to know, if I were to ask for
17        those PDF documents, HD would be in possession
18        of those; correct?
19   A    I think those have already been submitted.
20   Q    Okay.  And maybe so.  I just want to make sure
21        we're all on the same page that the documents
22        that you're referring to is not something that
23        is no longer in HD's possession.
24   A    Right.
25   Q    Okay.  And you also talked about, for lack of a
```

```
 1         better term, ride-alongs where a new technician
 2         would ride along with a more experienced
 3         technician.  Is that the process that you were
 4         describing?
 5    A    Yeah.
 6    Q    Okay.  And tell me what -- what the more
 7         experienced technician would be looking for from
 8         a new technician.
 9    A    Again, standards; right?  So just making sure
10         that they're putting the connectors on according
11         to the Cox standard and that they're checking
12         the levels leading into the house to make sure
13         that the levels are up to standard and how to --
14         how to maintain the equipment.  That's the bulk
15         of it, is that, making sure that standard is
16         met.
17    Q    Okay.  We talked about the PDF documents.  We
18         talked about the ride-along.  And other than
19         that, would a new tech receive any other
20         training?
21    A    That's the primary.  I mean, for a new tech,
22         that's the primary method.  If Cox rolls out
23         something new, then they typically send that
24         information to us to provide to the technicians
25         for a new product or standard if their standard
```

1         changes for some reason.

2    Q    Okay.  Well, if their standards change, do you

3         have to meet with all of your techs, even the

4         ones that are experienced, and advise them of

5         the change in circumstances?

6              MR. LEWIS:

7                   Objection to the form of the question.

8    MR. HAYES:

9    Q    You can answer.

10   A    Yeah.  I don't know.  Like, that's pretty

11        general.  That's pretty general.  You know, if

12        it's related to the technical standard, if they

13        change a technical standard and it's going to

14        impact the customer, then we have to inform the

15        technicians about that change; yes.

16   Q    And how would you go about doing that?  Would

17        you hold a meeting, or would it just be an

18        email?  Tell me about that process.

19   A    I mean, it depends on the -- it depends on the

20        thing.  So usually, meetings aren't required for

21        that type of thing.  It's just communicated to

22        them, but it depends on what it is.

23             Like, sometimes it's a -- it's a simple

24        thing where we just have to make sure everybody

25        knows.  If a meeting is required, then, you

```
 1        know, we would have a meeting.  But the --
 2             MR. HAYES:
 3                  I think it froze for a second.  Okay,
 4             we're back.
 5   MR. HAYES:
 6   A    Yeah.  So if a meeting is required, you know, we
 7        would have a meeting.
 8   Q    Okay.
 9   A    But if a meeting is not required, then we would
10        just communicate the information.  Does that
11        makes sense?
12   Q    Yeah.  If the techs had -- well, strike that.
13             Was there a manager or a supervisor that the
14        techs in the field would have to report to if
15        they had an issue or a problem?
16   A    The lead technicians would be probably the first
17        person for them to talk to.
18   Q    Okay.  I'm not familiar with HD's structure.  We
19        have field technicians, and there's an assigned
20        lead technician for all the other technicians?
21   A    Typically, yes.
22   Q    Okay.  And does that lead technician change, or
23        it's someone who's been there for a number of
24        years?
25   A    I mean, it could change.  I mean, it's like
```

```
1          everything else; right?
2     Q    Uh-huh.
3     A    But you're not necessarily going to have the
4          same technician with the same lead person every
5          time, but it could happen for a while.
6     Q    Uh-huh.  Yeah.  Who does the lead technician
7          answer to?
8     A    Stephen Becnel (ph) would be the first line.
9          The first person for that person to talk to
10         would be Stephen Becnel.
11    Q    Okay.  And what type of things would a field
12         technician call Stephen Becnel to talk to him
13         about?
14    A    I mean, I don't know.  I wouldn't be called, so
15         I can't --
16    Q    Right.  That would be a question for Stephen
17         Becnel?
18    A    I mean, just in general terms, if the technician
19         has problems or let's say he can't get to the
20         house or something, then, you know, he would --
21         he would call the lead technician or maybe
22         notify dispatch.  So it's not -- the situation
23         you're describing doesn't really -- I don't
24         know.  It would be like a limited case
25         situation, so I don't know really how to answer
```

```
 1           that part.
 2   Q    Okay.  In what circumstances would the
 3        technicians interact with the dispatchers?
 4   A    A customer's not home, "This equipment is not
 5        working," you know, "I can't get this equipment
 6        to work," "I have to leave today.  I can't -- I
 7        have to leave right now.  I can't finish my
 8        day."  So stuff like that.
 9   Q    Does HD ever change -- I understand what you
10        told me before, that Cox sets the routes for the
11        day.  Does HD or employees of HD ever change the
12        routes for a day?
13   A    That -- that could happen.
14   Q    Okay.  And under what circumstances would that
15        happen?
16   A    I don't really monitor to that level of detail,
17        to be honest with you.  But again, if we change
18        something, then the Cox system is pretty
19        automated.  So if we make a change, it's going
20        to change it back or it'll change it to
21        something else.  So some of this is, if you
22        start with a certain set of jobs in the morning,
23        by 11 o'clock, the Cox system could rearrange
24        those jobs automatically, regardless of how it
25        started in the morning.
```

```
 1    Q    Who had authority within HD to go in and change
 2         jobs in the Cox system?
 3              MR. LEWIS:
 4                   Objection to the form of the question.
 5    MR. HAYES:
 6    Q    You can answer.
 7    A    So I'm not sure what you mean by "who had
 8         authority."  Who can potentially do it?
 9    Q    Well, no.  Maybe it was a bad question.  I just
10         want to know, as a matter of practice, who would
11         do it.  I know you said that on occasion that
12         would happen, and I'm just curious to find out
13         who within HD would actually make the change.
14              MR. LEWIS:
15                   Objection.
16    MR. HAYES:
17    A    I mean, a number of people have access to be
18         able to do that.  I mean, the dispatchers could
19         change it.  Stephen Becnel could change it.  So
20         it's a number of people that could change it.
21    Q    Okay.  Does HD maintain a warehouse where the
22         equipment for the installs are housed or
23         maintained?
24    A    Yes.
25    Q    Okay.  And where is that?
```

```
 1   A     777 Behrman Highway.
 2   Q     Okay.  Anytime before the technicians started
 3         their route for the day, would they have to go
 4         to the warehouse to pick up equipment?
 5   A     Occasionally.  It depends on what they have on
 6         their van.
 7   Q     Okay.  So if they didn't have the equipment on
 8         their van for the work assigned in a given day,
 9         they would have to go to the warehouse to pick
10         up that equipment; is that correct?
11   A     Sometimes.  It depends on what they're missing,
12         you know.  Typically, the goal is to have them
13         with enough -- part of the technician's
14         responsibility is to manage their inventory, so
15         they should be able to maintain enough to have
16         enough equipment on the truck to handle whatever
17         they might be assigned in a given day, anyway.
18         So typically, the technician is not just going
19         every day to the warehouse.  But if they have,
20         like if you were just missing one box, I mean,
21         sometimes that box is brought out to them.  It
22         just depends on, you know, that's a very
23         specific thing.  But in general, they have to
24         make sure that they have equipment.  So the
25         purpose of going to the warehouse is to stock up
```

1       the van for whatever routes or jobs you may have

2       during that week or two weeks.

3  Q   Does HD keep track of the number of times a

4       technician has to go to the warehouse in a given

5       week?

6           MR. LEWIS:

7             Objection to the form of the question.

8  MR. HAYES:

9  A   We track the inventory and when it's assigned to

10      technicians.

11  Q   Well, I guess what I'm trying to find out, for

12      instance, if I wanted to find out the number of

13      times Lonnie Treaudo went to the warehouse

14      during his tenure with HD, is there a document

15      within HD that would show you that?

16  A   Yes.  I mean, we would pull the times that

17      equipment was assigned to him from the

18      warehouse, and that's how we know he had to go

19      to the warehouse on those days.

20  Q   Okay.  And you still maintain that type of data?

21      If I were to ask for it, you'd be able to or HD

22      would be able to produce it?

23  A   Not easily, but it's something that we would

24      have to compile individually, so it'd take some

25      time to gather that information, but -- but we

```
 1        could produce that information for a specific
 2        technician.
 3   Q    Okay.  How does dispatch and scheduling work for
 4        non-Cox clients?
 5             MR. LEWIS:
 6                  Objection.
 7   MR. HAYES:
 8   A    I'm sorry.  I don't even understand the question
 9        for that.
10   Q    Sure.  Sure.  I know that you said that the
11        majority of the work was done for Cox; that
12        that's your primary client; correct?
13   A    That is a primary -- that is a project that we
14        have.  I don't -- I mean, I don't want to get
15        into classifying primary or secondary or
16        tertiary.  Every client is important to us,
17        so --
18   Q    No.  What I'm trying to get at is, I thought you
19        testified that, other than Cox, you do or the
20        technicians do work for other entities or
21        clients other than Cox; is that -- is that true?
22   A    I mean, there's no dispatching or scheduling
23        similar to the Cox project for other projects.
24        If it's a different project, then you know what
25        I mean?  It's not -- so that question -- I don't
```

58

```
 1        see how the question -- it's not -- the
 2        dispatchers don't work on any other projects.
 3        Those dispatchers work on the Cox project --
 4    Q   Well, do your -- do your technicians work on any
 5        other projects besides Cox projects?
 6    A   They -- they are free to do whatever they want
 7        to do outside as long as they're not needed.  So
 8        some of them have done other things outside of
 9        specifically for Cox.
10    Q   Well, that's -- that's not my question.
11    A   And on occasion --
12    Q   But go ahead.  That's not my --
13    A   Well, go ahead.  I don't know -- okay.  What was
14        the question?
15    Q   Yeah.  What I'm asking you -- yeah, what I'm
16        asking you is this.  I thought you said that Cox
17        was not the only entity that HD performed
18        projects for.
19    A   Correct.
20    Q   Okay.  So -- and for all those other projects
21        other than Cox, did you use technicians to
22        service those projects?
23    A   On occasion; yes.
24    Q   Okay.  So what I'm getting at is this.  On those
25        other projects when you used technicians to
```

```
1        service those projects, how would they get those
2        job assignments?
3   A    It's just different.  So it's just a different
4        type of job, so you're talking about maybe one
5        day to go and do something at an office.  Let's
6        say, then and it wasn't all of the Cox
7        technicians.  But there are some of them that
8        did other projects when they came up, and they
9        would just coordinate with the person that
10       requested the -- the work.  So they would
11       coordinate with the company and schedule a time
12       for when they would go and do the job.
13  Q    How would they know that there was another
14       project out there other than Cox?
15  A    If it came -- I mean, if it came through HD,
16       then either myself or Stephen Becnel would
17       contact them or the -- and a couple of times, I
18       think the other party contacted them as well.
19  Q    So on the occasions when there were other
20       projects other than Cox, you would instruct the
21       technicians to be in contact with the client to
22       arrange to perform the work; is that what I'm
23       hearing?
24            MR. LEWIS:
25                 Objection.
```

1   MR. HAYES:

2   A    I mean, we would just coordinate the time, a

3        mutually agreeable time for them to show up and

4        do the work.

5   Q    Then you would communicate that to the

6        technician?

7             MR. LEWIS:

8                  Objection.

9   MR. HAYES:

10  A    I mean, sometimes it's the third party and the

11       technician.  Sometimes it was me.  It just

12       depends on the scenario.

13  Q    Well, that's what I'm trying to get to the

14       bottom of.  On these other projects, if you had

15       a technician such as, you know, Terraine Dennis,

16       would the entity just call them without having

17       HD involved if it was an HD project?

18            MR. LEWIS:

19                 Objection to the form of the question.

20            You can answer.

21  MR. HAYES:

22  A    If it's an HD project, then I'm going to be in

23       the loop somehow.  But if it's not an HD

24       project, they are certainly free to go do

25       whatever they want to do.

```
 1   Q    Yeah, well, I'm not talking about that.  What
 2        I'm talking about is HD projects.  You would be
 3        in the loop and communicating with the
 4        technician as to the other work for an HD
 5        project?
 6   A    Yes.
 7   Q    Correct?  Okay.
 8   A    Yes.
 9   Q    I want to talk to you a bit about the routing in
10        a given day.  How would a technician receive his
11        route for a day?
12   A    Through the Cox app.
13   Q    Okay.  And what was that app called?  Was it ETA
14        Direct?
15   A    Yes.
16   Q    Okay.  So he would -- and I want you to correct
17        me if I'm wrong.  He would log on to -- he or
18        she would log on to the ETA Direct app, and his
19        routes for that day would be populated; is that
20        true?
21   A    Correct.
22   Q    Okay.  And tell me a little bit about how those
23        routes are staggered as far as time.  Are the
24        routes assigned according to time slots or
25        otherwise?
```

```
 1    A    Time slots.
 2    Q    Okay.  And what was the first time slot that was
 3         assigned or that would be assigned to a route?
 4    A    8:00 to 10:00.
 5    Q    Okay, 8:00 to 10:00 would be the first time
 6         slot.  What would be the second?
 7    A    10:00 to 12:00.
 8    Q    And after that?
 9    A    1:00 to 3:00.
10    Q    And after that?
11    A    3:00 to 5:00.
12    Q    Okay.  Were there any routes after that?
13    A    Occasionally, 5:00 to 7:00.
14    Q    Okay.  Okay.  Could a technician choose to do
15         his 8:00 to 10:00 time slot at 5:00 to 7:00, or
16         did he have to do it in the order it was
17         assigned?
18              MR. LEWIS:
19                   Objection to the form of the question.
20    MR. HAYES:
21    A    That's -- that varies by technician.  I wouldn't
22         say order that it was assigned, but you know,
23         technicians have done jobs that were scheduled
24         for later earlier.  Usually, if you have a
25         different time, you're usually doing a job that
```

```
 1           was scheduled later earlier.  But in some cases,
 2           we've had technicians do jobs after the initial
 3           start time in different order.  But ideally, you
 4           know, you would expect to start with your 8:00
 5           to 10:00.  And then depending on what happens
 6           throughout that day, that's more of a thing that
 7           the technician is responsible for communicating
 8           with the customers on the schedule or, you know,
 9           the order that he finishes and completes jobs,
10           that's more really technician dependent.
11   Q       So could a technician get his route for the day
12           and then decide on his own in which order he was
13           going to do the route?
14   A       I mean, within the -- within the context, like
15           if you're expecting somebody to be at your
16           house, they still have to consider the customer;
17           right?  So if you're expecting someone to be at
18           your house from 8:00 to 10:00, that's what the
19           customer agreed to with Cox, so that's the
20           starting point.
21   Q       So -- so what's the answer to my question?  If a
22           technician got a route for a given day, could he
23           just pick and choose in what order he wanted to
24           do the work, or would he have to follow the
25           route schedule?
```

1   A     I think your question is kind of fragmented.  So
2         the technician has -- they have to basically
3         start with the first job; right?  I mean, unless
4         something happened and the customer wasn't home.

5              But let's say that's an example.  They go to
6         their 8:00 to 10:00, the customer's not there,
7         so they call the customer.  They decide they're
8         going to do their next job because the first
9         job's not home and maybe the customer said
10        they'll be back at 11:00 or something.  So then
11        the technician can decide by communicating with
12        the customer, the next customer, "Hey, I'm going
13        to come early, and then I'm going to go back to
14        my other job after I" -- so basically, the
15        technician at that point is communicating with
16        the customer and swapping jobs.

17             But I will say that Cox does expect, if you
18        have an 8:00 to 10:00, you should be at that
19        first 8:00 to 10:00 first.  After that, as far
20        as the routed schedule for the day, the
21        technicians have some latitude in terms of
22        moving a job in early.  You know, it depends on
23        what happens with the customer.

24             So if you finish your -- if you finish
25        your -- let's say you finish your 10:00 to 12:00

```
1        as an example.  If you finish your 10:00 to
2        12:00 at 11 o'clock and your next job is a 1:00
3        to 3:00, that technician is able to call that
4        customer for the 1:00 to 3:00 and see if they're
5        home and if he's able to go earlier.  And if the
6        customer agrees to that, then he can go
7        earlier -- or she.
8    Q   So what you're saying is, in order to -- after
9        the first job, if the technician wanted to
10       juggle the order of his route, he would have to
11       get approval from the customer.  He couldn't
12       make that call on his own?
13   A   No; I'm not saying he needs approval from the
14       customer, but it would certainly be better if
15       the customer was actually home.  Otherwise, he
16       would waste his time driving over there.  So
17       typically, they're trying to make sure the
18       customer's home.
19   Q   What I'm -- what I'm trying to get to, Mr.
20       Davillier, is this.  After -- I think you've
21       already said he's expected to be on his first
22       job, that 8:00 to 10:00 job?
23   A   Right.
24   Q   But after that -- but after that, could a
25       technician on a whim, for whatever reason, just
```

```
1           decide he was going to do the 5:00 to 7:00 slot
2           in the 10:00 to 12:00 and mix up the order just
3           because that's the way he wanted to do it?
4      A    I mean, the commitment that Cox has with the
5           customer is the baseline.  So the goal for the
6           technician is to follow that.  But at the same
7           time, things happen throughout the day, so I
8           mean, the technician has -- has that control if
9           something happens.  Then they have to modify the
10          order of those stops to communicate with the
11          customer and make that decision.
12     Q    Could a technician --
13     A    But I wouldn't say it's random.  If you schedule
14          an electrician to come to your house, then, you
15          know, you expect them there at a certain time.
16          If that's different, just common customer
17          courtesy is to kind of have a phone call or
18          something.  So I'm just -- there's going to be
19          some coordination; yes.  But --
20     Q    If a technician gets a route in a given day, can
21          he just pick and choose which jobs that he wants
22          to do?  If he decides that he just doesn't want
23          to do the 10:00 to 12:00 slot job, is he free to
24          just ignore that job?
25               MR. LEWIS:
```

```
 1                    Objection.  Asked and answered.
 2              MR. HAYES:
 3                    No.
 4   MR. HAYES:
 5   Q    You can answer.
 6   A    I mean that -- you're talking about a
 7        hypothetical situation that -- that doesn't
 8        really fit.  I mean, there have been times where
 9        the technician has decided for various reasons
10        that he couldn't do a job, and they communicated
11        that and didn't do the job.  But it just depends
12        on the technician's assessment of that location
13        and that particular job.
14              I would say that the contract agreement --
15        the agreement in place even with Cox is that
16        technicians are expected to go out and perform a
17        service for a Cox customer.  So that is the
18        basic requirement, is that when you agree to
19        take a route for a day or whatever as working as
20        a contractor on this project, your agreement is
21        that you understand you are there to meet the
22        requirements of the Cox customer.  So the
23        foundation of the operation is that we're
24        meeting the customer requirements, and the
25        technician is basically expected to me the
```

1          customer requirements because that's the
2          obligation.
3                    MR. HAYES:
4                         All right, well, I'm going to object to
5                    the responsiveness because that's not the
6                    question I asked you.
7     MR. HAYES:
8     Q    The question I asked you is not about whether he
9          could physically perform it or not, but my
10         question is, if I have a route on a given day
11         and I'm a technician and I, for whatever reason,
12         I just decide I don't want to do that 10:00 to
13         12:00 route not that I can't; I just don't want
14         to, am I free to just not do that particular
15         job, or would there be consequences for it?
16                   MR. LEWIS:
17                        Objection.
18    MR. HAYES:
19    Q    Subject to it.
20    A    I mean, I don't know.  I mean, if you decide --
21         if you have a commitment and you decide not to
22         make that commitment, then, you know, I can't
23         say that -- then you're not meeting the terms of
24         your contract at that point; right, with Cox?
25         You're not -- we're not meeting the terms of our

```
 1        contract with Cox, and the independent

 2        contractor is not meeting their terms or their

 3        obligation in terms of servicing the customers

 4        for those days.

 5             So in general terms, they can make that

 6        decision.  The consequences for that is very

 7        specific, and it depends on the scenario.  So to

 8        answer your question, in general terms,

 9        technicians are free to make decisions about

10        what they do throughout the day.  The

11        consequences for those decisions vary just like

12        consequences for anything else.

13   Q    Well, Mr. Davillier, I think we're all free to

14        do whatever we want to do throughout the day,

15        but my question to you is much more specific

16        than that.  If the technician just decides that

17        he's not --

18             MR. ZIMMER:

19                  Preston, hold on just a second.

20             MR. LEWIS:

21                  One second, Preston.

22             MR. HAYES:

23                  Yeah.

24             MR. LEWIS:

25                  Preston, Charlie -- I'm sorry.
```

```
 1              Somebody was trying to say something.
 2         MR. ZIMMER:
 3              Yeah, Preston, this is Charlie.  Look,
 4         I'm not a big fan of speaking objections,
 5         and I'm not certainly going to --
 6         MR. HAYES:
 7              Yeah.  And look, I'm not -- Jonathan's
 8         there.  I mean, you both objecting is not
 9         proper.
10         MR. ZIMMER:
11              No.  Here's what is proper.  You have
12         to stop making speaking objections to my
13         client about what you think about his
14         testimony.
15         MR. HAYES:
16              No.
17         MR. ZIMMER:
18              You can't tell him, "I don't like Your
19         answer.  That's not what I" --
20         MR. HAYES:
21              I objected to the responsiveness.
22         MR. ZIMMER:
23              No.  No.  Your objection --
24         MR. HAYES:
25              Who's -- who -- which one of you --
```

```
 1              which one of you is defending?  Is it
 2              Jonathan or you?
 3         MR. ZIMMER:
 4              You're making speaking objections.  I'm
 5              telling you now --
 6         MR. HAYES:
 7              I'm going to object to you speaking
 8              because Jonathan's been the one objecting,
 9              and now you're jumping in objecting.  I
10              mean, who's it going to be, you or Jonathan?
11         MR. ZIMMER:
12              So Madame Court Reporter, please mark
13              the record at this point.
14              And you've now -- you understand our
15              position.  Please stop making speaking
16              objections to our client.  You've got it.
17              Move ahead.
18    MR. HAYES:
19    Q    My question to you, Mr. Davillier, is, is it
20         acceptable -- on behalf of HD, is it acceptable
21         for a technician to choose to just not do a job
22         assigned to him in a given day?
23    A    I believe that I've answered your question.
24    Q    My question is on the -- is on the table.
25    A    I've answered that to the best of my ability.
```

Case 2:19-cv-10635-ILRL-JVM   Document 94-1   Filed 10/06/20   Page 73 of 140

72

```
1    Q    My question to you is, is it acceptable for
2         HD -- on behalf of HD for a technician to choose
3         not to do a particular job assigned to him in a
4         given day?
5              MR. LEWIS:
6                   Objection.
7    MR. HAYES:
8    A    That has happened before.
9              MR. HAYES:
10                  Well, let me object to the -- to the
11             responsiveness.  I didn't ask if it's
12             happened before.
13   MR. HAYES:
14   Q    I said, is it acceptable on behalf of HD for a
15        technician to simply not do a job assigned to
16        him in a given day?
17             MR. LEWIS:
18                  Objection to the form of the question.
19   MR. HAYES:
20   A    In certain situations, yes.
21   Q    Okay.  And what would those situations be?
22   A    I've already explained that to the level of
23        detail that I can.
24   Q    Well, that's -- but my question as it was on the
25        table, you said under certain circumstances.
```

337-237-4434                    goDEPO                    800-503-2274
                             www.goDEPO.com

```
 1        I'm asking you what circumstances those would
 2        be.
 3    A   It's the same thing that I spoke about earlier,
 4        is just, you know, if the technician evaluates
 5        that job and decides that they can't do it,
 6        then, you know, we would address that either
 7        with the customer or whatever the resolution is
 8        for that particular job.  But overall, you know,
 9        the goal is to meet the customer requirements
10        and complete service for a customer to the
11        extent that it's possible.
12            I'll give you an example if you want a
13        specific example.  If you have to go in a
14        customer's attic at one o'clock and you didn't
15        know you would have to do that, but you feel as
16        a technician that it's not safe to go in the
17        attic at that time and you communicate to the
18        customer that "We're going to have to reschedule
19        this at a different time on a different day, and
20        we're going to have to come out earlier because
21        I have to do some work in the attic," for HD and
22        Associates, that would be acceptable.
23    Q   In that scenario, would they have to notify HD
24        of that?
25            MR. LEWIS:
```

```
 1                    Objection.
 2   MR. HAYES:
 3   A    Yes, because we would have to reschedule the
 4        appointment.
 5   Q    Okay.  Has HD ever disciplined a technician for
 6        failing to show up to an appointment on his
 7        route?
 8            MR. LEWIS:
 9                Objection to the form of the question.
10   MR. HAYES:
11   A    I can't say that I know that specific
12        information off the top of my head right now.
13   Q    Would that be documented somewhere in HD's
14        records?
15   A    Probably not.
16   Q    Okay.  Is there someone else within HD that
17        would be a better person to answer that
18        question?
19   A    No.
20   Q    Okay.  Do you consider the technicians to be
21        highly-skilled laborers?
22            MR. LEWIS:
23                Objection.
24   MR. HAYES:
25   Q    You can answer.
```

```
 1   A    I mean, the technicians have to be able to
 2        perform the job, and it does take a certain
 3        amount of skill and management ability.
 4   Q    Are there any educational requirements to become
 5        a technician at HD?
 6             MR. LEWIS:
 7                  Objection.
 8   MR. HAYES:
 9   A    I mean, mostly everyone finishes high school,
10        but it's not a specific -- specific educational
11        requirement.  There is no college degree, but
12        there are usually, like I said, a lot of
13        technicians have years of experience.
14   Q    Are there any certifications that technicians
15        are required to obtain in order to be a
16        technician for HD?
17   A    Cox does require certain NCT I think
18        certifications.  So those are -- those are
19        pretty standard in terms of the industry, so --
20   Q    Who would issue that type of certification?
21   A    Typically, it's a third-party company.  I mean,
22        the majority of the technicians already have it
23        from a previous engagement, so --
24   Q    Would HD maintain a copy of those types of
25        certifications that you just referenced?
```

1    A    Not -- not really; no.  It's more of a question
2         that we ask, if the technicians have it or not.
3    Q    Okay.  Would there be an interview process?  You
4         just referenced that it's a question that you
5         would ask the technician.  Is there an interview
6         process that the technician would go through
7         before becoming an HD technician?
8    A    Typically, they would talk to someone; yeah.
9         Either -- usually, most likely, Stephen Becnel
10        and sometimes myself.
11   Q    And what type of information would you require
12        from the technician during that process?
13   A    The information necessary to complete a
14        background check, and that's a Cox requirement.
15        So primarily that and then just kind of a
16        conversation about ability and work history and,
17        you know, that type of thing.
18   Q    Were the HD technicians required to undergo a
19        drug screen?
20   A    Yes.
21   Q    Okay.  And that was a policy of Cox; correct?
22   A    Correct.
23   Q    Okay.  And was that same policy adopted by HD
24        through its field service agreement with Cox?
25   A    Yes.

```
 1   Q    Okay.  And again, the background screening or
 2        the background check, that was a Cox
 3        requirement; correct?
 4   A    Correct.
 5   Q    And that same policy was adopted by HD through
 6        its field service agreement with Cox; correct?
 7   A    Correct.
 8   Q    Was there a list of the tools needed for the job
 9        provided by HD to the technicians?
10             MR. LEWIS:
11                  Objection.
12   MR. HAYES:
13   Q    Subject to it.
14   A    In general, yeah.
15   Q    Okay.  Do you have a copy of the tools list that
16        would be provided to a technician?
17   A    I think, yeah; we should have that.
18   Q    Okay.  Were there any tools -- of course, I
19        don't know, but were there any particular tools
20        that were required for installation of Cox
21        equipment?
22   A    I'm sorry.  Did you just ask me that?
23   Q    Well, what I'm getting at.  As I understand,
24        there's a general tools list, but are there any
25        special tools that are required to install Cox
```

```
1          cable boxes?
2     A    Right.  That would have been on the tools list.
3     Q    Okay.  And if they didn't have the tools on the
4          tools list, could the technicians purchase those
5          tools from HD?
6     A    We would typically purchase the tools and then,
7          yeah; the technicians would pay for the tools.
8     Q    Okay.  What about the wiring or cable or
9          whatever you call it, the cable or the wiring?
10         Would that be purchased from HD by the
11         technicians for the jobs?
12    A    No.  That's provided by Cox.
13    Q    Okay.  So the actual cable or the wiring, that
14         would be at the warehouse and available for the
15         technicians?
16    A    Yes.
17    Q    Okay.  So when the technician came to the
18         warehouse to pick up equipment, he could also
19         pick up whatever wiring or cable he would need
20         for his jobs?
21    A    Correct.
22    Q    Okay.  And he wasn't charged for that?
23    A    No.
24    Q    Okay.  What about the cable boxes or modems?
25         Did the technician have to pay for those, or was
```

1       that provided to him?

2    A  They were provided.

3    Q  Okay.  Does HD own vehicles that were also

4       available for lease or rent by the technicians?

5    A  Yes.

6    Q  Okay.  Was there any signage that was required

7       to be placed on the vehicles by the HD

8       technicians?

9    A  We followed the guidelines for the Cox signage

10      requirements.

11   Q  Okay.  And what were those?

12   A  Have the company logo and Cox-authorized vendor.

13   Q  Okay.

14   A  Or something along those lines.  Whatever the

15      sign says, but I think that's it.

16   Q  Do you still maintain a copy of the logo that's

17      placed on the outside of vehicles as per the

18      field service agreement?

19   A  Yes.

20   Q  So if I wanted to obtain one of those, HD

21      possesses that?

22   A  The logo?

23   Q  Yes, sir.

24   A  Yes.

25   Q  I assume it's a magnetic decal; is it, that is

```
 1            to be placed on the door of the vehicle?
 2     A    Typically, yes.
 3     Q    Okay.  What about uniforms?  Are the technicians
 4            required to wear any particular type of uniform?
 5     A    Yes, per the FSA, it's a uniform that has kind
 6            of the same thing; a logo with authorized -- the
 7            Cox logo on the shirt as well as our logo and
 8            "authorized vendor."
 9     Q    Okay.  How is it that -- maybe there isn't a
10            way, but let me ask it this way.  When a
11            technician goes into a home, is there a specific
12            way that he's to introduce himself to the
13            customer?
14     A    By name and -- yeah.  I mean, typically, it's
15            not that formal.  So you know, the customer's
16            already expecting him, so --
17     Q    Okay.  Is he permitted to provide other services
18            other than the services he's there to provide on
19            behalf of Cox to customers of Cox?
20     A    Typically, if you're there -- if Cox sends you
21            there for the work for Cox, at that visit,
22            that's what you're expected to perform.
23     Q    Okay.  And a technician wouldn't be permitted to
24            offer other services that he may offer outside
25            of what he's there for to perform for Cox; is
```

```
 1        that fair?

 2   A    I think that's -- that's probably Cox's

 3        expectation; yes.

 4   Q    Okay.  Well, through your field service

 5        agreement with Cox, has HD adopted the same

 6        rules, regulations, and expectations that Cox

 7        has provided to the technicians?

 8             MR. LEWIS:

 9                  Object to the form of the question.

10   MR. HAYES:

11   A    I mean, regarding that, regarding that specific

12        scenario and example, I would have to refer to

13        the actual FSA document regarding that specific

14        thing.

15   Q    And I guess what I'm getting at is, HD would

16        expect the technicians to follow the Cox

17        guidelines; is that a fair statement?

18   A    Correct.  So if that specific scenario's covered

19        in the Cox guidelines, I would have to refer to

20        the guidelines to confirm that.

21   Q    Yeah.  And what I was referring to is just

22        generally.  You know, generally speaking, an HD

23        technician would be expected to follow the Cox

24        guidelines?

25   A    In general, yes.
```

```
1    Q    Okay.  Can a technician hire whoever he wanted
2         to go do the work assigned by HD?
3              MR. LEWIS:
4                   Objection.
5    MR. HAYES:
6    A    As long as they met the Cox requirements in
7         terms of background check to be on customer
8         premises, yes; he could.
9    Q    Well, I'm not asking that.  What I'm asking is
10        this.  If I were a technician with HD, could I
11        assign it to just anyone without them meeting
12        any of the requirements by Cox?
13   A    Well, no, because you're going into someone's
14        home who's a Cox customer, so there are certain
15        CPNI regulations that anybody on the property
16        for the purpose of doing a job has to be
17        approved by Cox.  But he could hire whoever he
18        wanted to hire.  They would just have to be --
19        that person would have to be approved by Cox --
20   Q    Okay.
21   A    -- in terms of -- in terms of passing a
22        background check and a drug screening that Cox
23        requires.  But outside of that, he can -- he's
24        free to hire whoever he wanted to.
25   Q    Was it permissible for technicians to swap out
```

```
 1          jobs in their routes without notifying HD?
 2               MR. LEWIS:
 3                    Objection.
 4     MR. HAYES:
 5     Q    You can answer.
 6     A    I don't know what you mean when you say "swap
 7          out jobs."
 8     Q    Sure.  If I were a technician and I had a given
 9          route and I had a friend who was a technician
10          who had a given route, could be just swap jobs;
11          I'd go do his 10:00 to 12:00 job slot and he
12          performed mine without notifying HD that we did
13          that?
14     A    I mean, they would still have to close the jobs
15          out, so somebody would have to reassign those
16          jobs for them.
17     Q    And would that be an HD dispatcher?  Would they
18          perform that function?
19     A    Yes.
20     Q    Okay.
21               MR. HAYES:
22                    Guys, it's 12:15.  I probably have
23               another hour and a half of questioning.
24               Let's take a short lunch break, maybe 30
25               minutes if that works for you, and resume
```

```
 1            about 12:45.
 2            MR. LEWIS:
 3                 That works.
 4            MR. HAYES:
 5                 All right, talk to y'all soon.
 6                 (Off the record.)
 7            MR. HAYES:
 8                 We're back on the record.
 9    MR. HAYES:
10    Q    Mr. Davillier?
11    A    Yes, sir.
12    Q    Did HD also use something called a Slack App?
13    A    Yes.
14    Q    Okay.  Tell me what the Slack App was used for?
15    A    Just communications throughout the day.
16    Q    Would the HD dispatchers also utilize the Slack
17         App?
18    A    Yes.
19    Q    And would they use that to communicate with the
20         technicians?
21    A    Yes.
22    Q    What types of things would they communicate with
23         the technicians throughout the day?
24    A    I mean, I guess like specific equipment that are
25         needed to go onto accounts.  If the technician
```

```
 1        couldn't -- you know, if the customer wasn't
 2        home, things like that.
 3   Q    Besides --
 4   A    Just related to whatever the technician was
 5        working on that day.
 6   Q    Okay.  Besides the technicians and the
 7        dispatchers, were any of the management team,
 8        like Stephen Becnel, also on Slack App?
 9   A    Yes.
10   Q    And what would he do with the Slack App?
11   A    Post communications to whoever he needed to
12        communicate something with, typically.
13   Q    Do you know if those communications are retained
14        by HD?
15   A    They are on the Slack server, and I don't have
16        access to direct messages between two
17        individuals.
18   Q    Okay.  I'm not familiar with the Slack App
19        whatsoever.  What type of information -- if you
20        went on there today, what type of historical
21        data would you be able to obtain, if you know?
22   A    I'm not sure.
23   Q    Okay.  Were the technicians required to sign up
24        for the Slack App?
25   A    Yes.
```

```
 1   Q    Okay.  Does HD warrant or guarantee the quality
 2        of every installation or repair job which was
 3        performed by its technicians?
 4             MR. LEWIS:
 5                  Objection to the form of the question.
 6   MR. HAYES:
 7   Q    You can answer.
 8   A    I would have to refer to the F -- we follow the
 9        FSA requirements.  I would have to refer to that
10        document.
11   Q    Okay.  What about quality control?  Does HD
12        provide any QC for the work performed by the
13        technicians?
14   A    Well, Cox provides QC for the work performed.
15   Q    What would that entail?
16   A    I'm not sure.  I mean, they'd send somebody out
17        to inspect it to make sure that it meets the Cox
18        standards, so --
19   Q    Okay.  But there wouldn't be someone within HD
20        that would periodically QC the work performed by
21        the technicians?
22   A    Periodically, yeah.
23   Q    And who within HD would perform the QC work?
24   A    It would be the -- the lead technicians.
25   Q    Okay.  And --
```

```
 1    A     Or sometimes Stephen Becnel.
 2    Q     Okay.  And what would happen in the event a
 3          particular job failed a QC check?
 4    A     In general, it depends on the scenario.
 5    Q     Is it possible for a technician to be back
 6          charged for that work if it failed QC?
 7              MR. LEWIS:
 8                    Objection to the form of the question.
 9  MR. HAYES:
10    A     It's possible, but it wasn't -- it wasn't
11          customary or standard for HD.
12    Q     Okay.  Is there a document within HD that would
13          show us which jobs were QC'd in a given year?
14    A     No.
15    Q     How would HD determine which jobs it would
16          perform a QC check on?
17    A     It was up to whoever was doing the QC.  You
18          know, I mean, we didn't have a person
19          specifically that went to a job to QC it every
20          day.  So it was more of a if you're out, if
21          you're out and about in a certain area.  Like,
22          it was a process that each person made a
23          decision on.
24    Q     Okay.  So there was no formula within HD where
25          they would QC every fiftieth job for a
```

```
 1         technician?

 2              MR. LEWIS:

 3                   Objection to the form of the question.

 4   MR. HAYES:

 5   A    No.

 6   Q    Okay.  If a technician had a question about a

 7        particular job, who would the technician call?

 8   A    I believe I've answered that already, I think.

 9   Q    Was it --

10   A    It was probably the lead.

11   Q    Okay.  I want to talk to you about some of the

12        documents in this case.

13              MR. HAYES:

14                   Jonathan, do you have a copy of those?

15              MR. LEWIS:

16                   Yes; I've got a copy of the ones you

17        sent.

18              MR. HAYES:

19                   Correct.

20   MR. HAYES:

21   Q    I want to look at first the initial disclosures

22        of HD and Associates.

23              MR. LEWIS:

24                   Initial disclosures.

25   MR. HAYES:
```

```
 1    A    Okay.
 2    Q    And particularly, I'm looking at page number 2.
 3         Well, it starts on page 1, just individuals who
 4         are likely to have discoverable information that
 5         HD may use to support its position in this
 6         action.  And I'm looking down at number 9 and
 7         beyond.  Let me know when you get there.
 8    A    Okay.
 9    Q    The name, Vanessa Swafford (ph).  Can you tell
10         me, who is Vanessa Swafford and what does she
11         do?
12    A    She processes payroll.
13    Q    Okay.  Is she an employee of HD?
14    A    No.
15    Q    Okay.  Who does she work for?
16    A    I'm not -- she works for herself, I guess.
17    Q    Okay.  She doesn't work for Paychex or Netchex
18         or one of those firms that processes payroll?
19         That's what I'm getting at.
20    A    No.
21    Q    Okay.  In the past three years, has HD changed
22         who processes payroll for it?
23    A    We did a switchover.  I think it was '17.  I
24         don't remember the exact date, but we did switch
25         over from I think it was Paychex or somebody to
```

```
 1        Vanessa Swafford.
 2   Q    Okay.  And she processes your payroll to this
 3        day?
 4   A    Yes.
 5   Q    Okay.  Now I'm looking at number 10.  You
 6        identified as corporate representative or HD
 7        identified a corporate representative of Grayco.
 8        What is it that HD, if you know, intends to call
 9        Grayco Communications to testify about?
10             MR. LEWIS:
11                  Objection to the form of the question.
12   MR. HAYES:
13   A    I don't know.
14   Q    Okay.  In also number 11, technicians employed
15        by Grayco Communications.  Do you know what, if
16        anything, HD intends to call Grayco
17        Communications' technicians to testify about in
18        this matter?
19             MR. LEWIS:
20                  Objection to the form of the question.
21   MR. HAYES:
22   A    No.
23   Q    Okay.  Do you know why it is that they're listed
24        in here as number 10 and number 11?
25             MR. LEWIS:
```

```
 1                    Objection.
 2   MR. HAYES:
 3   A    I think in general, the intent was to answer the
 4        information.
 5   Q    Yeah.  And the information was people who would
 6        have discoverable information that HD may use to
 7        support its position in this action, and I was
 8        just trying to find out what information these
 9        individuals have that HD intends to use.
10   A    I don't know.  I don't know.
11   Q    Did HD model its business plan or business model
12        off of the Grayco business model?
13             MR. LEWIS:
14                  Objection.
15   MR. HAYES:
16   A    I don't -- you would have to send me their
17        business model.
18   Q    Okay.  Did you have any knowledge whatsoever of
19        how Grayco paid its technicians?
20             MR. LEWIS:
21                  Objection.
22   MR. HAYES:
23   A    I mean, I don't know directly.
24   Q    Okay.  Have you ever spoken to anyone within
25        Grayco about this case?
```

```
 1              MR. LEWIS:
 2                   Objection.
 3   MR. HAYES:
 4   A    No.  Not that I remember.
 5   Q    Okay.  Have you spoken with anyone inside Cox
 6        about this case?
 7              MR. LEWIS:
 8                   Objection.
 9   MR. HAYES:
10   A    No.
11   Q    Are they aware it's going on right now?
12              MR. LEWIS:
13                   Objection.
14   MR. HAYES:
15   A    I don't know.
16   Q    Okay.  Switching gears a little bit, does HD
17        track the total hours worked by a technician in
18        a given day?
19   A    The technician is responsible for opening and
20        closing their jobs out, so we do know when they
21        were -- when they opened and closed the job.
22              MR. HAYES:
23                   I'm going to object to the
24              responsiveness.
25   MR. HAYES:
```

1    A    We do have access to that information per

2         technician.

3              MR. HAYES:

4                   I'm going to object to the

5              responsiveness.

6    MR. HAYES:

7    Q    My question to you is, does HD track the total

8         number of hours worked in a day by a technician?

9    A    We track the time that the technician opens and

10        closes jobs throughout the day.

11   Q    And that's it?  Nothing more?

12   A    I mean, like I said, they open and close jobs in

13        the system, so there's no time clock, if that's

14        what you're asking.  But we do know when they

15        open the job and when they close the job.  We

16        know when they picked up equipment at the

17        warehouse.

18   Q    That's not my question.  My question is, do you

19        track -- does HD maintain a document that tracks

20        the total amount of hours a technician works in

21        a day?

22   A    We calculate the hours based on if it's needed

23        to be calculated as in we've done for this case.

24        We submitted documentation based on the hours

25        that the technician tracks, opens and closes

```
 1          jobs and picks up equipment from the warehouse.
 2    Q     So is there a document that I can look at within
 3          HD that would tell me the total amount of hours
 4          that each technician worked in a given workweek?
 5    A     On a recurring basis?
 6    Q     Yes.
 7    A     Like, you're saying do I have something that
 8          shows the complete history for every technician
 9          back to whenever we started?
10    Q     No.  I'm just talking about the technicians in
11          this case and for the time periods they worked
12          for HD.
13    A     We've submitted the information we have in
14          return as regards to -- I think we turned over
15          something related to that for Byron Taylor.
16    Q     Okay.  So --
17    A     So that would be the information we have.
18    Q     So you believe that HD has already turned over
19          all of the documents in its possession that
20          would show the amount of hours a technician
21          would work in a workweek; is that true?
22              MR. LEWIS:
23                  Objection to the form of the question.
24    MR. HAYES:
25    A     For the -- for the people in the case, as far as
```

```
 1          I'm aware, I believe that's true.
 2   Q    Okay.  And I've seen the documentation that
 3          you've turned over, the Excel spreadsheets.
 4          Where is that document maintained?
 5   A    I'm not sure I understand your question.
 6   Q    Sure.  Sure.  Is that document or is that
 7          information, is it maintained by HD, or is that
 8          maintained in a Cox system?
 9   A    That's -- that information is derived when the
10          technician on his or her device signs in to a
11          job or signs out of a job.  That's -- that's how
12          that information is generated.
13   Q    Before this case began, did HD ever go back and
14          look and try to figure out how many hours
15          technicians were working during a workweek?
16              MR. LEWIS:
17                  Objection.
18   MR. HAYES:
19   A    I'm not sure I understand your question.
20   Q    Yeah.  Before this case began, did HD ever have
21          a reason to go back and try to figure out how
22          many hours a technician was working during a
23          workweek?
24              MR. LEWIS:
25                  Objection.
```

```
 1   MR. HAYES:
 2   A    We -- in a workweek, we made sure that whatever
 3        we paid a technician was within the definition
 4        of what the agreement stated they should be
 5        paid.
 6   Q    So -- so who within HD would go back and review
 7        the data that you provided me to make that
 8        determination?  Would that be you or Stephen
 9        Becnel?
10   A    That would be me.
11   Q    Okay.  So on a weekly basis, you would review
12        the technician's hours to make sure that they
13        worked "X" number of hours in a week?  I mean,
14        what were you doing?  Why would you do that?
15             MR. LEWIS:
16                  Objection.
17   MR. HAYES:
18   A    Again, so our contract has a floor in it, so I
19        wanted to make sure that they were at least
20        being paid according to the contract.  So if it
21        was a case that was close, then I would have to
22        determine, you know, what happened or whatever,
23        you know.  So -- but in most cases, we were
24        within the guidelines of the agreement.  So the
25        reason I did that was to make sure we were --
```

1       the floor was met and we were at least paying

2       them a minimum.

3   Q   Can you tell me as you sit here today, Mr.

4       Davillier, which technicians in the year 2018

5       were paid on an hourly basis and not a point

6       system?

7               MR. LEWIS:

8                   Objection.

9               MR. HAYES:

10                  What is the basis of your objection,

11              Jonathan?  You keep saying "objection" after

12              every -- after every question I ask.  Is

13              there a basis for it?

14              MR. LEWIS:

15                  Yeah, because your question is -- yeah.

16              Your question is based upon speculation on a

17              broader range of information outside of the

18              scope of this time frame here.  In order for

19              my client to know that, he would actually

20              have to have that information in front of

21              him.  You're asking very specific and

22              targeted information in a very assumption

23              manner.  You've got to have -- you've got to

24              lay a foundation for it.

25              MR. HAYES:

```
 1                   Then he can say, "I don't know."  Then
 2              he can say -- if the answer's "I don't
 3              know," then the answer is "I don't know."
 4              That's not the basis for an objection.
 5         MR. LEWIS:
 6                   Part of the objection is -- part of the
 7              objection is that you failed to -- lack of
 8              laying a foundation for your question.
 9              Ask -- ask a more targeted question.
10         MR. HAYES:
11                   Well, this is a -- this is a -- this is
12              a discovery deposition and not -- not trial.
13              So if he doesn't know the answer, then the
14              answer is, "I don't know."
15    MR. HAYES:
16    Q    Now I'm going to ask you again.
17    A    Okay.
18    Q    I'm going to ask you again, Mr. Davillier, in
19         the year 2018, as you sit here today, do you
20         know of any technicians that were paid on an
21         hourly basis as opposed to being paid per point?
22              MR. LEWIS:
23                   Objection.
24    MR. HAYES:
25    A    I don't know.
```

1    Q    Okay.  In the year 2019, do you know of any

2         technician that was paid on an hourly basis

3         versus being paid by point?

4              MR. LEWIS:

5                   Objection.

6    MR. HAYES:

7    A    I don't understand your question, so I really --

8         I'm confused by your question.

9    Q    Okay.  Well, let me see if I can retry it again.

10        Do you know, in 2019, did HD pay any tech based

11        upon the hours actually worked versus paying

12        them on a point or piece rate system?

13   A    So from the inception, HD has paid technicians

14        according the agreement, so I would refer you to

15        the agreement.

16             MR. HAYES:

17                  No, well, I'm going to object to the

18             responsiveness.

19   MR. HAYES:

20   Q    And I'll ask it again.  In 2019, do you -- are

21        you aware of any technicians that were paid

22        based upon the hours worked instead of being

23        paid on a point system?

24   A    Let me see if I can answer it differently.  We

25        have a contractual agreement, and that

1          stipulates how the pay is going to be done, and

2          we've always paid the technicians in accordance

3          with that agreement.

4     Q    So the answer to my question is no.  All

5          technicians in 2019 were paid based upon the

6          points earned and not the hours worked; is that

7          fair?

8               MR. LEWIS:

9                    Objection.  Mischaracterizes the

10               earlier testimony.

11     MR. HAYES:

12     A    I believe, sir, that is your answer to your

13          question.  That is not my answer to your

14          question.

15     Q    Well, I'm asking you, can you identify any

16          technicians that were paid based upon the actual

17          hours worked in 2019 instead of being paid based

18          upon the points earned per job?

19     A    A service technician was paid based on the

20          agreement.

21               MR. HAYES:

22                    All right, well, I'm going to object to

23               the responsiveness.

24     MR. HAYES:

25     Q    You're not answering my question.  I'm going to

1      ask it again.

2           In 2019, do you know whether or not any

3      technicians were paid based upon the hours

4      worked instead of being paid on the points per

5      job?

6           MR. LEWIS:

7                Objection.

8  MR. HAYES:

9  A    Every technician was paid based on the

10     agreement.

11          MR. HAYES:

12               Okay.  What I'm going to do at this

13               point in time, I'm going to reserve my

14               rights to file a motion to compel an answer

15               to that -- that question.

16               Ma'am, would you please certify that

17               question for me?  Thank you.

18  MR. HAYES:

19  Q    I'm going to refer you to the documents that

20     your counsel has there in front of you.  It's

21     marked as Exhibit 2, and it's an eleven-page

22     document.  It looks to be an advice of deposit

23     for Byron Taylor.

24  A    Okay.

25  Q    Let me know when you've had a chance to review

```
 1         those, sir.
 2    A    Okay.
 3    Q    Does this document reflect anywhere the number
 4         of hours Byron Taylor worked during any pay
 5         period?
 6    A    No.
 7    Q    Okay.  Does it reflect any hourly rate that was
 8         paid to Mr. Taylor during this pay period?
 9    A    No.
10    Q    Okay.  In fact, doesn't it reflect the amount of
11         money earned by Mr. Taylor for work performed on
12         a points-based system?
13    A    No.
14    Q    It does not?
15    A    Well, I mean, look, it's based on the contract
16         document.  So I don't -- the only thing I'm
17         saying is, you are referring to a points-based
18         system.  It's the contractual obligation in the
19         document.  So it reflects that he was paid based
20         on that document; yes.
21    Q    Mr. Taylor, how was Byron Taylor paid (sic)?
22         And the answer -- I'm not -- I understand what
23         you're saying about the contract.  What I'm
24         asking you is, was he paid based upon an hourly
25         rate, an hour basis, or was he paid based upon
```

```
 1        the points earned?
 2   A    If you need to refer to the contract, I would
 3        suggest that you do that, but he was paid based
 4        on the contract.  And I'd like the record to
 5        reflect that my name's actually John Davillier.
 6        If you keep referring to me as Byron Taylor, I
 7        don't want that to be in the record because it's
 8        not accurate.
 9   Q    My question to you, Mr. Davillier, is that Byron
10        Taylor was paid based upon the points he earned
11        in a given workweek and was not paid based upon
12        a calculation of the hours he worked times an
13        hourly rate; is that correct?
14             MR. LEWIS:
15                  Objection.
16   MR. HAYES:
17   A    I would refer you to the contract document.
18             MR. HAYES:
19                  Ma'am, would you please certify that
20        question as well.  And I'll reserve my
21        rights to file a motion to compel an answer
22        to that question.
23   MR. HAYES:
24   Q    As you sit here today, Mr. Davillier, do you
25        know of any documents which would reflect the
```

```
 1        amount of money that HD has invested in its
 2        company to perform the services on behalf of
 3        Cox?
 4   A    Not to my knowledge directly.  I'm not sure.
 5   Q    Do you know whether or not that would be
 6        reflected on HD's tax return?
 7   A    I'm not sure directly.
 8   Q    Okay.  Who performs tax services on behalf of
 9        HD?
10   A    J.W. Accounting.
11   Q    J.W. Accounting.  And where are they located?
12   A    In Metairie.
13   Q    And how long has J.W. Accounting performed tax
14        services for HD?
15   A    Since we started.
16   Q    Okay.  Are all of the technicians involved in
17        this lawsuit -- are they substantially similar
18        in their job duties?
19   A    I'm not sure.  I mean, your question is
20        pretty -- pretty broad and vague.  I'm not
21        really sure how to answer.
22   Q    Well, would -- would all of the technicians in
23        this lawsuit have serviced Cox projects?
24   A    Yes.
25   Q    Okay.  And the contracts that the entered into
```

```
 1            with HD, would they have been substantially
 2            similar?
 3    A       Yes.
 4    Q       And the method in which they were paid, would
 5            that likewise be substantially similar?
 6    A       Yes.
 7    Q       What differences can you point to, if any, exist
 8            between the plaintiffs in this lawsuit, which
 9            include the opt-in plaintiffs?
10                 MR. LEWIS:
11                      Objection.
12    MR. HAYES:
13    A       I mean, I can't answer that sitting here right
14            now without more context.
15    Q       Okay.  Were they all required to log in to the
16            ETA Direct system to get their jobs at the
17            outset of the day?
18    A       Yes.
19    Q       Okay.  Were they all required to download the
20            Slack App for communication purposes?
21    A       Yes.
22    Q       Were they all subject to QC checks of the
23            completed jobs?
24                 MR. LEWIS:
25                      Objection.
```

```
1    MR. HAYES:

2    A    No.

3    Q    Okay.  Of the individuals involved in this

4         lawsuit, which ones were not subject to QC

5         checks?

6              MR. LEWIS:

7                   Objection.

8    MR. HAYES:

9    A    I'm not sure.

10   Q    Okay.  Did any of these technicians have any

11        control over the type of work order that was

12        assigned to him or her?

13             MR. LEWIS:

14                  Objection.

15   MR. HAYES:

16   A    I don't believe so.

17   Q    Okay.  What would happen if a technician fell

18        behind on his work orders for a given day?

19        Would those be reassigned to another technician?

20   A    It depends.

21   Q    Is it possible that that would happen?

22   A    Yes.

23   Q    And that reassignment would be handled by the HD

24        dispatchers; correct?

25             MR. LEWIS:
```

```
 1              Objection.
 2   MR. HAYES:
 3   A    Possibly.  Not always.  Sometimes Cox -- Cox
 4        would reassign it or the system, the Cox system,
 5        would automatically reassign it.  So if another
 6        technician is close by and the technician falls
 7        behind, the Cox system knows that other
 8        technician is close by and would reassign that
 9        job.
10   Q    Would any of the technicians be required to stay
11        available for new jobs if they finished their
12        route early in a given day?
13              MR. LEWIS:
14              Objection.
15   MR. HAYES:
16   A    No.  Not as a matter of practice, I mean.  I'm
17        not sure what you're -- your question is just
18        really, really completely general, and it makes
19        a lot of -- there are so many different
20        scenarios.  It's difficult to just answer that.
21        But --
22   Q    Well, and what I'm looking for is practices and
23        procedures imposed by HD.  So with that in mind,
24        what I'm asking you is that, if a technician
25        finished their full route early in the day, were
```

```
 1          they required to notify the office or just go
 2          home?  What was that process like?
 3   A     It varies by technician.
 4   Q     Okay.  And what would cause the variance?
 5   A     The technician.  Some technicians want to work
 6          late and have an opportunity to earn more.
 7   Q     Well, the only way a technician could earn more
 8          would be taking on more jobs; correct?
 9               MR. LEWIS:
10                   Objection.
11   MR. HAYES:
12   A     I'm not -- within HD?
13   Q     Yes, sir.
14   A     Correct.
15   Q     Okay.  If a technician finished a particular job
16          more quickly, that didn't mean the job was worth
17          more points than if he finished it within let's
18          say the full two hours allotted to him for that
19          time slot; is that true?
20               MR. LEWIS:
21                   Objection to the form of the question.
22   MR. HAYES:
23   A     No; that's not accurate.
24   Q     Okay.  So my understanding -- and correct me if
25          I'm wrong -- that when paid on a point system,
```

```
 1        the technicians receive Two Dollars ($2.00) per
 2        point if their have their own vehicle or 1
 3        point -- or is it A Dollar, Eighty ($1.80) per
 4        point if they leased a vehicle from HD; is that
 5        true?
 6   A    Yes.
 7   Q    Okay.  So if, for instance, their 8:00 to 10:00
 8        slot job was worth ten points and they finished
 9        that job in five minutes, they would receive
10        ten; right?
11   A    I'm sorry.  They will receive what?
12   Q    Yeah.  If the 8:00 to 10:00 slot, if the job
13        assigned during that slot was worth ten points,
14        if they finished that job within five minutes,
15        they would earn ten points; correct?
16   A    Correct.
17   Q    And likewise, if they took two hours to finish
18        that job, they would still receive ten points;
19        correct?
20   A    Not necessarily.  If they took two hours because
21        the technician evaluated the customer's house
22        and they decided that more work was needed, they
23        can add the additional work that they're
24        performing, and they could get -- potentially
25        get more than ten points for that work.
```

```
 1    Q    That's not the question I asked.

 2    A    But it's situation specific.

 3    Q    No; that's not the question.

 4    A    Now, I've answered the question you asked me.

 5    Q    No.  I don't want to spar with you, but my

 6         question is, it's not adding work.  I'm talking

 7         about the same scope of work.  If a job is worth

 8         ten points, and it doesn't matter whether or not

 9         the tech finishes that job in five minutes or

10         two hours for the same scope of work, it's only

11         going to be worth the points assigned for that

12         job; isn't that correct?

13    A    You're -- you're -- so you're asking me a

14         different question now.

15    Q    No.

16    A    Because you added the part about the scope of

17         work.  If nothing changes in what has to be done

18         for that job, then yes.  But it doesn't mean

19         that they show up at this house for a ten-point

20         job and if they take two hours, they're always

21         going to just get ten points.  It depends on the

22         job.

23    Q    Yeah.  The only way that would change, based

24         upon your testimony, is if work was added to

25         that job once they were on site; correct?
```

1    A    By the technician; yes.

2    Q    Correct?  Okay.

3    A    Correct.  By the technician; yes.

4    Q    But if the scope of the job didn't change and

5         the job was worth ten points, it didn't matter

6         whether they completed that work or five minutes

7         or two hours.  It was only and always going to

8         be worth ten points; correct?

9              MR. LEWIS:

10                  Objection.

11   MR. HAYES:

12   A    Sometimes.

13   Q    Well, in what instances would that not be true,

14        other than adding to the scope of work, which

15        you've testified to?  When the scope of the work

16        stays the exact same, when does the amount of

17        time a technician takes to finish a project

18        change the value of the project?

19   A    You would have to refer me to the specific

20        example you're talking about.  So it's kind of a

21        hypothetical general situation.  So sometimes

22        what you said would be true.

23   Q    My question to you is, when the scope of work is

24        not changed and you have a time slot from 8:00

25        to 10:00 and the scope of the work is the exact

1        same and they finish that job within 15 minutes

2        versus two hours, it doesn't change the value or

3        the points assigned to that job; does it?

4  A    That is true sometimes.

5  Q    Well, you keep adding that quantifier

6        "sometimes."  So I want to know, given the

7        example I just gave you, when is that not true?

8  A    I've explained it, but it's terminology, so I'm

9        not sure how to answer your question, because

10       you're -- you are inserting a term, "scope of

11       work" that is pretty general and I just don't

12       want to give you an answer that may not be in

13       some situations completely accurate.  It may be

14       accurate in other situations.  So that's the

15       only reason I'm putting my qualifier in.  But

16       you're asking about my qualifier when the

17       qualifier is there because of the question that

18       you asked.  So I'm just trying to answer your

19       question accurately.

20  Q    Well, and I don't want to confuse you.  And if

21       the term, "scope of work," is a confusing term

22       for you, let me try it this way.  If the 8:00 to

23       10:00 project required an installer or

24       technician to go out to the job site and install

25       a cable box and that cable box installation was

```
1        worth five points and nothing else changed,
2        nothing was added to that job, whether or not he
3        performed that cable box installation in 15
4        minutes or two hours wouldn't change the amount
5        of points assigned to that cable box
6        installation; would it?
7    A   No.
8    Q   Okay.  I want to look at your affidavit that was
9        provided in this matter, and it's Exhibit 1.
10       It's a five-page document.
11            MR. LEWIS:
12                 Hold on one second, Preston.  I think
13            it's still on my desk.
14            MR. HAYES:
15                 Okay.  Sure.  Hey, Jonathan?  Jonathan?
16            MR. LEWIS:
17                 Yeah.
18            MR. HAYES:
19                 You want to take five minutes?  That
20            way you can go get it and he can review it?
21            A five-minute break?
22            MR. LEWIS:
23                 Well, I'm just going to go grab it off
24            the desk.  I don't really need five minutes.
25            MR. HAYES:
```

```
 1                    Okay.
 2             MR. LEWIS:
 3                    I'm just grabbing it and bringing it
 4             over.
 5             MR. HAYES:
 6                    All right.  Cool.
 7  (Mr. Lewis leaves the deposition briefly and returns
 8  with the document.)
 9             MR. LEWIS:
10                    Okay, Preston, Exhibit 1, the
11             affidavit.
12  MR. HAYES:
13  Q    Yeah.  I'm looking at page 3, paragraph 13.
14  A    Okay.
15  Q    I'll give you a chance to review that if you
16       need to.  Just let me know when --
17  A    Okay.
18  Q    You're ready?  Okay.
19            I'm looking at the graph that was done on
20       paragraph 13 under the heading, "Total hours
21       between start and stop."  Can you explain that
22       to me?
23  A    I don't see a graph.
24  Q    Well, let me hold it up if you can see it.
25       Maybe you can't.  It says "Byron Taylor.  Week
```

| | | |
|---|---|---|
| 1 | | with HDA," and there's a heading called -- |
| 2 | A | Oh, you're talking about the table? |
| 3 | Q | Yeah; the table or whatever you want to call it. |
| 4 | | Yeah. |
| 5 | A | Okay.  I see that. |
| 6 | Q | Okay.  And there's a column that says total |
| 7 | | hours between start and stop; do you see that? |
| 8 | A | Yes. |
| 9 | Q | Okay.  Can you tell me how it is that you |
| 10 | | computed the time contained in that particular |
| 11 | | column? |
| 12 | A | Well, I didn't compute the time, but that's the |
| 13 | | time that he logged in to the system; right?  So |
| 14 | | if he logged in to his first job, that would be |
| 15 | | the start time, and the start time would be the |
| 16 | | time that he logged out of his last job. |
| 17 | Q | Okay.  So -- |
| 18 | A | In general. |
| 19 | Q | So -- yeah.  I just want to make sure I |
| 20 | | understand what that column represents.  For |
| 21 | | that given week, in other words, we have a week |
| 22 | | with HDA, and it's got Week 1.  Do you see that? |
| 23 | A | Yes. |
| 24 | Q | And it's got 25.25.  I'm assuming that |
| 25 | | represents hours; correct? |

```
 1   A    Correct.
 2   Q    And what that column reflects, that number,
 3        25.25, what that reflects is the aggregate
 4        number or aggregate hours between start and stop
 5        for each project?
 6   A    No.
 7   Q    Okay.  Explain that.  Explain it to me, then,
 8        because I'm missing something.
 9   A    Let me explain it again.  The start is the time
10        he started his first job.
11   Q    Okay.
12   A    The stop is the time that he stopped his last
13        job.
14   Q    Okay.  All right.  And I see it in the lunch
15        column, you have four hours.  Do you know
16        whether or not Mr. Taylor took a lunch on those
17        days?
18            MR. LEWIS:
19                Objection.
20   MR. HAYES:
21   A    I don't know offhand.  I mean, there are breaks
22        between jobs, so he certainly would have had
23        plenty of time to have lunch or run errands or
24        do whatever else he wanted to do.
25   Q    But do you know whether in fact he did take a
```

```
 1        lunch between -- between jobs?
 2             MR. LEWIS:
 3                  Objection.
 4    MR. HAYES:
 5    A    I can say that I know there was time between
 6         jobs for him to have taken a one-hour lunch on
 7         any given day.
 8    Q    Are you --
 9    A    I'm pretty certain of that.  I mean, I'm pretty
10         certain of that.
11    Q    Have you ever talked to Mr. Taylor and asked him
12         of he did in fact take a lunch on any given
13         workday?
14             MR. LEWIS:
15                  Objection.
16    MR. HAYES:
17    A    Not specifically; no.
18    Q    Are you aware that there are some techs who do
19         not take lunch breaks?
20             MR. HAYES:
21                  Objection.
22    MR. HAYES:
23    A    No.
24    Q    You're not aware of that?
25    A    I'm not.
```

```
 1   Q    Okay.  This start/stop time, that would not
 2        include the time spent at the warehouse
 3        gathering materials; would it?
 4             MR. LEWIS:
 5                  Objection.
 6   MR. HAYES:
 7   A    No.
 8   Q    Okay.  Do you know typically how long a
 9        technician spends at the warehouse gathering
10        materials for a given week or day?
11             MR. LEWIS:
12                  Object to the form of the question.
13   MR. HAYES:
14   A    That's something that varies by technician.
15   Q    Okay.  And that's not tracked?  The actual time
16        spent at the warehouse is not something that's
17        tracked by HD; correct?
18   A    No.  Not specifically.  But at the same time, we
19        do know what time they checked out equipment.
20        So in general terms, it's between 30 minutes to
21        one hour.
22   Q    Are you aware of whether or not sometimes
23        technicians have to wait in line to check out
24        equipment?
25             MR. LEWIS:
```

```
1                    Objection.
2    MR. HAYES:
3    A    I'm not aware specifically of that; no.
4    Q    Are you -- are you in a position to testify that
5         that did not happen?
6              MR. LEWIS:
7                    Objection.
8    MR. HAYES:
9    A    I think my testimony kind of stands.  It
10        typically takes a technician between 30 minutes
11        to an hour to get whatever they need from the
12        warehouse.
13   Q    How did you come up with that estimate?
14             MR. LEWIS:
15                   Objection.
16   MR. HAYES:
17   A    That's typically what it takes.  If I have --
18        once they get their equipment, then, you know,
19        they have their equipment.  So you know, there's
20        nothing else -- nothing else to get at that
21        point.  There's no other reason for them to be
22        there.
23   Q    Are you at the warehouse every morning when the
24        equipment's being handed out?
25             MR. LEWIS:
```

```
 1                    Objection.
 2   MR. HAYES:
 3   A     No.
 4   Q     Okay.  Are you the one that assigned equipment
 5         to the technicians?
 6   A     No, but if a technician -- if a technician is at
 7         the warehouse and they check out equipment, I
 8         know the time that they checked it out, and I
 9         know when the next technician started checking
10         in equipment.  So I can find that information
11         out, I should say.  But -- so --
12   Q     But do you know, sir, how long that technician
13         may have waited in line to check out that
14         equipment?
15              MR. LEWIS:
16                   Objection to the form of the question.
17   MR. HAYES:
18   A     That's very specific, so that could vary.
19   Q     Is there any record within HD which would show
20         the amount of time a technician waited in line
21         before being able to check out equipment?
22              MR. LEWIS:
23                   Objection to the form of the question.
24   MR. HAYES:
25   A     No.
```

121

```
 1   Q    Were technicians permitted to use non-approved
 2        tools on any of the Cox jobs?
 3   A    I'm not sure what you mean.
 4   Q    Well, you testified earlier that there was a
 5        took list that was provided to the technicians;
 6        correct?
 7   A    Correct.
 8   Q    And were technicians allowed to use tools that
 9        were not on that list on Cox jobs?
10   A    Yeah.  If they had their own tools that met the
11        requirements to get the job done.
12   Q    Okay.  So would they be allowed to use any wire
13        that they wanted as long as it got the job done?
14   A    Well, the wire is not really a tool, so
15        that's --
16   Q    Well, I'm asking you a different question.
17   A    All I'm saying is, if the job requires a hammer,
18        then you can't use a screwdriver.
19   Q    Yeah, well, that's common sense I would imagine.
20   A    But you can use --
21   Q    What I'm asking is --
22   A    Well, you should rephrase your question, then, I
23        guess, because it's not really clear.
24   Q    Okay.  Well, I'll do that for you.
25   A    You can use whatever tool you want.
```

```
 1   Q    I'll do that for you.  If a tool is not on the
 2        tool list, that's not on the tool list, would it
 3        be permissible for a technician to use a non-
 4        approved tool on a Cox job?
 5   A    In general, if it meets -- if it serves the same
 6        function and it's the correct type of tool, yes.
 7        I'm not -- like, if you have a -- if you have a
 8        Husky tool or a Craftsman tool, if it serves the
 9        same function, you can use either one.
10   Q    Okay.  Now this is a different question.  What
11        about wiring?  Could you use whatever wire you
12        wanted to use on a particular project, or did it
13        have to be wire approved by Cox?
14   A    Well, Cox provides a wire.
15   Q    Okay.  So could you use any wire on the project
16        that was not provided by Cox?
17   A    If somebody wanted to go by Cat 6 cable out of
18        their pocket and install it instead of using the
19        Cat 6 cable that Cox provided them, they could
20        do that.
21   Q    Are you aware of that ever happening?
22   A    I'm not sure.
23   Q    You don't know whether it did or didn't?
24   A    No.  I mean, I don't know.  I mean, the
25        technician -- let's say for a Cat 6 thing, I
```

```
 1         mean, if you -- if you don't have any on your
 2         truck and Home Depot is around the corner, you
 3         could certainly go to Home Depot and get some
 4         wiring, so --
 5    Q    Do you know if any of the technicians engaged in
 6         any marketing or advertising on their own
 7         behalves and held them out to be independent
 8         installation companies when they were servicing
 9         the Cox jobs?
10              MR. LEWIS:
11                   Objection to the form of the question.
12   MR. HAYES:
13    A    I'm not sure offhand.
14    Q    Are you ever aware of that happening?
15              MR. LEWIS:
16                   Objection.
17   MR. HAYES:
18    A    I'm not sure.
19    Q    You're not sure if it happened or not?
20              MR. LEWIS:
21                   Objection.
22   MR. HAYES:
23    A    It may have.  I'm not certain.  I would have to
24         refer to something.
25    Q    Well, let me ask you this, Mr. Davillier.  I'll
```

1      ask it to you in this manner.  If the

2      technicians took the stand at the trial of this

3      matter and said that never occurred, would you

4      be in a position to refute that?

5           MR. LEWIS:

6                Objection.

7  MR. HAYES:

8  A    I don't even know how to answer that.

9  Q    Okay.  Fair enough.

10          Who ultimately made the decision to classify

11     the technicians as independent contractors

12     versus employees?

13          MR. LEWIS:

14               Objection.

15  MR. HAYES:

16  A    I mean, we -- I worked with my attorney, and we

17     came up with the agreement for the technicians

18     and set up the structure.

19  Q    On behalf of HD, who made that call to classify

20     the technicians as independent contractors

21     versus employees?

22          MR. LEWIS:

23               Objection to the form of the question.

24  MR. HAYES:

25  A    I would have relied on counsel, and we drafted

1       the document.  So I'm answering your question in

2       my response.  I'm not sure of what else you

3       really need.  It was with the advice of counsel.

4   Q   Well, that's what I'm looking for.  It was you

5       with the advice of counsel; is that correct?

6   A   Yes.

7   Q   Okay.  Who was counsel?

8   A   Davillier Law Group.

9   Q   Was there any certifications made to Cox that HD

10      was complying with the Fair Labor Standards Act?

11  A   Yes.

12  Q   So at the inception of your agreement with Cox,

13      you were aware of the Fair Labor Standards Act

14      and its requirements?

15          MR. LEWIS:

16              Objection.

17  MR. HAYES:

18  A   Again, I consulted with counsel to make sure

19      that we met the requirements of the FSA, and

20      that's what we did.

21  Q   And that would have been including certifying

22      that you were complying with the Fair Labor

23      Standards Act; correct?

24  A   Yes.

25          MR. HAYES:

```
 1                  I think I'm wrapping up.  Just give me
 2             five minutes to go over my notes.  Take a
 3             five-minute break, and I think I'm almost
 4             done.
 5                  (Off the record.)
 6   MR. HAYES:
 7   Q   All right, I just have one question related to a
 8       followup.  Who is Larry Buras?
 9   A   He's one of the lead technicians.
10   Q   Okay.  Is he an employee or an independent
11       contractor of HD?
12   A   He's an independent contractor.
13   Q   Okay.  What do his job duties entail?
14   A   We kind of went over that.  I mean, he's more of
15       a lead, so he -- he would be the person you
16       asked who the technicians would call if they had
17       issues.  That would be one of those people.
18             MR. HAYES:
19                  Okay.  I don't have any further
20             questions.  I think there's another attorney
21             on the phone.  Justine?
22             MS. DANIEL:
23                  Hi.  Yes.  I think we just have a
24             couple of questions to follow up.
25   EXAMINATION BY MS. DANIEL:
```

```
1   Q    Were any deductions taken from any of the
2        employees named in this suit?  Were any
3        deductions taken from their paycheck?
4   A    I'm sorry.  You broke up a little bit.
5   Q    Were any deductions taken from the paychecks of
6        any of the people employed by HD?
7   A    In general, yeah.  There were deductions for a
8        number of different things in general terms, but
9        typically, those are like child support
10       payments.  The vehicle leases is kind of built
11       in, so -- traffic tickets.  Camera tickets the
12       technicians are responsible for.  So things like
13       that.
14  Q    Were the vehicle leases required of all of
15       the -- all of the people that worked for HD, or
16       did only some choose to purchase the vehicle
17       leases or lease vehicles?
18            MR. LEWIS:
19                 Objection to the form of the question.
20  MS. DANIEL:
21  A    Could you repeat that?  I'm sorry.
22  Q    Did every technician lease vehicles and were
23       those deductions taken out, or did only some of
24       the technicians lease vehicles?
25  A    Some technicians had their own vehicles.
```

```
 1   Q    What other deductions would have been taken out
 2        besides the ones you just mentioned?  Were any
 3        taxes deducted?
 4   A    For the technicians?
 5   Q    Yes.
 6   A    No.  I mean, -- no.
 7   Q    What about insurance for the vehicles?  Were
 8        those deducted, or did HD pay for the insurance?
 9   A    It's kind of built into the points system.  So
10        whatever the point calculation is, the $1.80 --
11        if we're providing the vehicle for the
12        technicians.
13            MS. DANIEL:
14                No further questions.
15            MR. HAYES:
16                I think that's it.
17   THE DEPOSITION CONCLUDED AT 1:54 P.M.
18
19
20
21
22
23
24
25
```

1          REPORTER'S PAGE

2

3      I, Denise E. D'Arcourt, Certified Court Reporter

4   in and for the State of Louisiana, the officer, as

5   defined in Rule 28 of the Federal Rules of Civil

6   Procedure and/or the Article 1434(B) of the

7   Louisiana Code of Civil Procedure, before whom this

8   proceeding was taken, do hereby state on the Record:

9      That due to the spontaneous nature of the

10  interaction and discourse of the proceeding, double-

11  dashes (--) have been used to indicate pauses,

12  changes of thought and/or talkovers; that such is

13  the universally accepted method for a court

14  reporter's transcription of a proceeding; that

15  double-dashes (--) do not indicate that words or

16  phrases have been left out of the transcript;

17      And that the spelling of any words and/or names

18  which could not be verified through reference

19  resources have been denoted with the parenthetical

20  phrase "(spelled phonetically)."

21

22

23

24

25

CERTIFICATE

3      This certification is valid only for a
transcript accompanied by my original signature and
original required seal on this certificate.

6      I, Denise E. D'Arcourt, Certified Court Reporter
in and for the State of Louisiana, as the officer
before whom this testimony was taken via Zoom
videoconference, do hereby certify that JOHN
DAVILLIER, after having been duly sworn by me upon
authority of R.S. 37:2554, did testify on the 4th
day of September 2020, at New Orleans, Louisiana, as
hereinbefore set forth in the foregoing 129 pages;
that this testimony was reported by me in the
Voicewriting reporting method, was prepared and
transcribed by me or under my personal direction and
supervision, and is true and correct to the best of
my ability and understanding; that the transcript
has been prepared in compliance with the transcript
format guidelines required by statute and rules of
the board; that I am informed about the complete
arrangement, financial or otherwise, with the person
or entity making arrangements for deposition
services; that I have acted in compliance with the
prohibition on contractual relationships, as defined

1   by Louisiana Code of Civil Procedure, Article 1434,

2   and rules of the board; that I have no actual

3   knowledge of any prohibited employment or

4   contractual relationship, direct or indirect,

5   between a court reporting firm and any party

6   litigant in this matter, nor is there any such

7   relationship between myself and a party litigant in

8   this matter; that I am not related to counsel or to

9   any of the parties hereto, I am in no manner

10  associated with counsel for any of the interested

11  parties to this litigation, and I am in no way

12  concerned with the outcome thereof.

13        This 14th day of September 2020, New Orleans,

14  Louisiana.

15

16

17

18

19

20        _____

21              Denise E. D'Arcourt, CCR# 94078

22

23

24

25

**$**

**$1.80** 109:3 128:10
**$2.00** 109:1

**1**

**1** 89:3 109:2 113:9
114:10 115:22
**10** 90:5,24
**10:00** 62:4,5,7,15 63:5,
18 64:6,18,19,25 65:1,
22 66:2,23 68:12 83:11
109:7,12 111:25 112:23
**11** 53:23 65:2 90:14,24
**11:00** 64:10
**12:00** 62:7 64:25 65:2
66:2,23 68:13 83:11
**12:15** 83:22
**12:45** 84:1
**13** 114:13,20
**15** 112:1 113:3
**17** 89:23
**1:00** 62:9 65:2,4
**1:54** 128:17
**1st** 17:8,23

**2**

**2** 89:2 101:21
**20** 17:16
**2010** 9:17
**2016** 16:6
**2017** 8:15 17:8,18,23
**2018** 97:4 98:19
**2019** 18:10,14 20:23
99:1,10,20 100:5,17
101:2
**2020** 18:1,7,13,17 21:4,
11 23:7
**23** 21:5
**25.25** 115:24 116:3
**26** 21:6
**27** 21:6

**3**

**3** 114:13
**30** 83:24 118:20 119:10
**39** 26:18 27:2
**3:00** 62:9,11 65:3,4

**4**

**40-** 28:7

**46** 22:6,9 23:8,20,23
24:14 25:11,23,25 26:5,
14,16 27:14

**5**

**504** 31:22
**504-729-8082** 31:22
**5:00** 62:11,13,15 66:1

**6**

**6** 122:17,19,25

**7**

**70056** 6:17 8:1
**777** 6:17 7:25 55:1
**7:00** 62:13,15 66:1

**8**

**8082** 31:24
**8:00** 62:4,5,15 63:4,18
64:6,18,19 65:22 109:7,
12 111:24 112:22

**9**

**9** 89:6

**A**

**abilities** 46:14
**ability** 13:3 71:25 75:3
76:16
**acceptable** 71:20 72:1,
14 73:22
**access** 54:17 85:16 93:1
**accordance** 100:2
**account** 15:3 41:1,15
**Accounting** 104:10,11,
13
**accounts** 84:25
**accurate** 103:8 108:23
112:13,14
**accurately** 112:19
**Act** 125:10,13,23
**action** 89:6 91:7
**actual** 28:10 78:13 81:13
100:16 118:15
**add** 109:23
**added** 110:16,24 113:2
**adding** 110:6 111:14
112:5
**additional** 109:23
**address** 7:24 27:8 73:6

**addressing** 15:3
**adhere** 47:9,13
**adopted** 76:23 77:5 81:5
**advertising** 44:1 123:6
**advice** 101:22 125:3,5
**advise** 50:4
**affidavit** 113:8 114:11
**aggregate** 116:3,4
**agree** 6:4,9,11,15 26:12,
15 27:5,6,15 29:10 37:8
40:17 67:18
**agreeable** 60:3
**agreed** 63:19
**agreement** 7:18 41:10
48:12 67:14,15,20
76:24 77:6 79:18 81:5
96:4,24 99:14,15,25
100:3,20 101:10 124:17
125:12
**agrees** 65:6
**ahead** 20:13 30:8 31:11
34:10 37:18 40:8 48:14,
15 58:12,13 71:17
**allotted** 108:18
**allowable** 34:24
**allowed** 46:8 47:12
121:8,12
**alter** 12:16 13:3
**amount** 35:11,15 75:3
93:20 94:3,20 102:10
104:1 111:16 113:4
120:20
**answer's** 98:2
**answering** 27:21 100:25
125:1
**Anytime** 55:2
**app** 61:12,13,18 84:12,
14,17 85:8,10,18,24
105:20
**appears** 25:6
**application** 30:18 33:13
36:17
**applied** 21:24 22:22
23:3,10
**apply** 21:21 44:2
**applying** 45:17
**appointment** 74:4,6
**approach** 11:5
**approval** 65:11,13
**approved** 82:17,19
122:4,13
**aptitude** 45:8
**area** 87:21
**argue** 31:2
**arrange** 59:22
**arrangement** 16:20

**aspects** 10:6
**assess** 46:13
**assessment** 67:12
**assign** 13:9 14:22 82:11
**assigned** 9:22 10:3
12:11,18 51:19 55:8,17
56:9,17 61:24 62:3,17,
22 71:22 72:3,15 82:2
106:12 109:13 110:11
112:3 113:5 120:4
**assignment** 14:25
**assignments** 59:2
**assist** 10:9
**assistance** 24:9
**Associates** 8:3,7,8
28:14 73:22 88:22
**assume** 14:18 79:25
**assuming** 115:24
**assumption** 97:22
**assumptions** 27:8,10,12
**attic** 73:14,17,21
**attorney** 7:9 124:16
126:20
**auditor** 39:11 40:1
**authority** 54:1,8
**authorized** 80:6,8
**automated** 13:10,12
53:19
**automatically** 13:21
53:24 107:5
**aware** 92:11 95:1 99:21
117:18,24 118:22 119:3
122:21 123:14 125:13

**B**

**back** 8:14 9:15 16:8 17:7
20:14 31:8 32:7 51:4
53:20 64:10,13 84:8
87:5 94:9 95:13,21 96:6
**background** 76:14 77:1,
2 82:7,22
**bad** 54:9
**Ballard** 10:20 11:19,22
18:19
**bank** 25:17 28:23 36:18,
21,22,25 37:2
**Banks** 18:23,24
**based** 10:10 22:13 23:3,
15 25:15 33:25 41:7
93:22,24 97:16 99:10,
22 100:5,16,17,19
101:3,9 102:15,19,24,
25 103:3,10,11 110:23
**baseline** 66:5
**basic** 67:18
**basically** 64:2,14 67:25

**basis** 10:2 20:9,20 22:10
27:7 43:15 94:5 96:11
97:5,10,13 98:4,21 99:2
102:25
**Becnel** 8:20 10:8,20
11:18,20 52:8,10,12,17
54:19 59:16 76:9 85:8
87:1 96:9
**began** 95:13,20
**begin** 16:17
**beginning** 21:11
**begins** 15:8
**behalf** 6:2,6 21:25 43:15
46:6 71:20 72:2,14
80:19 104:2,8 124:19
**behalves** 123:7
**Behrman** 6:17 7:25 55:1
**big** 39:8 70:4
**bit** 21:15 43:18 46:23
61:9,22 92:16 127:4
**bore** 7:7
**bottom** 25:7 27:24 60:14
**box** 55:20,21 112:25
113:3,5
**boxes** 78:1,24
**break** 83:24 113:21
126:3
**breaks** 116:21 117:19
**briefly** 114:7
**bringing** 114:3
**broad** 104:20
**broader** 97:17
**broke** 127:4
**broken** 41:8
**brought** 55:21
**built** 127:10 128:9
**bulk** 49:14
**Buras** 126:8
**Bush** 20:2
**business** 7:24 16:20
37:10 91:11,12,17
**Byron** 94:15 101:23
102:4,21 103:6,9
114:25

**C**

**C-E-D-R-I--** 19:22
**cable** 38:20,23 45:11
78:1,8,9,13,19,24
112:25 113:3,5 122:17,
19
**calculate** 93:22
**calculated** 93:23
**calculation** 35:7 103:12
128:10

calculations 34:10
call 13:23 14:16 31:14, 25 32:1,17 43:21 52:12, 21 60:16 64:7 65:3,12 66:17 78:9 88:7 90:8,16 115:3 124:19 126:16
called 52:14 61:13 84:12 115:1
Calls 26:21 44:5
Camera 127:11
capacity 13:14
Carolyn 10:20 11:19,22 14:19 18:19
case 24:21 52:24 88:12 91:25 92:6 93:23 94:11, 25 95:13,20 96:21
cases 63:1 96:23
Cat 122:17,19,25
cease 41:22 42:3
Cedrika 18:23,24 19:22, 23,24
Cegrina 19:21
certification 75:20
certifications 75:14,18, 25 125:9
certify 101:16 103:19
certifying 125:21
chance 101:25 114:15
change 18:11,14 21:13 50:2,5,13,15 51:22,25 53:9,11,17,19,20 54:1, 13,19,20 110:23 111:4, 18 112:2 113:4
changed 9:18 12:13 17:23 89:21 111:24 113:1
charge 41:5
charged 78:22 87:6
Charles 6:2
Charlie 31:14 69:25 70:3
check 76:14 77:2 82:7, 22 87:3,16 118:23 120:7,13,21
checked 118:19 120:8
checking 49:11 120:9
checks 105:22 106:5
child 127:9
choose 62:14 63:23 66:21 71:21 72:2 127:16
circles 30:13
circumstances 50:5 53:2,14 72:25 73:1
claim 33:7,20
class 24:20
classifies 30:18

classify 9:6 21:3 124:10, 19
classifying 57:15
clean 43:25
clear 14:5 121:23
client 57:12,16 59:21 70:13 71:16 97:19
clients 57:4,21
clock 93:13
close 18:16 83:14 93:12, 15 96:21 107:6,8
closed 92:21
closes 93:10,25
closing 92:20
college 75:11
column 115:6,11,20 116:2,15
commitment 66:4 68:21, 22
common 11:4 66:16 121:19
communicate 51:10 60:5 66:10 73:17 84:19, 22 85:12
communicated 28:22 47:6 50:21 67:10
communicating 61:3 63:7 64:11,15
communication 105:20
communications 84:15 85:11,13 90:9,15
Communications' 90:17
companies 15:23,24 123:8
company 9:6,19,22 10:4 11:20,23 15:19,22 28:8 35:17 36:7 37:11 42:4 44:3 59:11 75:21 79:12 104:2
compel 101:14 103:21
compile 56:24
complete 16:4 47:12 73:10 76:13 94:8
completed 24:8 25:15 41:11 105:23 111:6
completely 107:18 112:13
completes 63:9
completing 41:13
complying 125:10,22
comprised 11:11
compute 115:12
computed 115:10
CONCLUDED 128:17
confirm 81:20
confuse 112:20

confused 99:8
confusing 112:21
connectors 47:23 49:10
consequences 68:15 69:6,11,12
considered 9:9
consistent 33:13
construction 39:10 40:1
consulted 125:18
contact 59:17,21
contacted 59:18
contained 115:10
context 63:14 105:14
continue 43:7,14
continuing 43:5
contract 41:7 42:10 43:1 48:11 67:14 68:24 69:1 96:18,20 102:15,23 103:2,4,17
contractor 18:6 21:3 22:21 67:20 69:2 126:11,12
contractors 17:20 18:3 25:5 28:2,14 30:2 32:17 33:8,20 43:20,22 124:11,20
contracts 46:9 104:25
contractual 99:25 102:18
control 10:12,16,19,24 12:16 66:8 86:11 106:11
conversation 76:16
Cool 114:6
coordinate 59:9,11 60:2
coordinates 12:5
coordination 66:19
copy 36:22 37:3 75:24 77:15 79:16 88:14,16
Corinne 18:21 19:11
corner 123:2
corporate 90:6,7
correct 8:3,4 17:5,6,21 20:7,17 26:14 28:17 29:9 37:22,24 38:5,10 41:16 42:6,7 43:2,8,15 47:10,11 48:18 55:10 57:12 58:19 61:7,16,21 76:21,22 77:3,4,6,7 78:21 81:18 88:19 103:13 106:24 108:8, 14,24 109:15,16,19 110:12,25 111:2,3,8 115:25 116:1 118:17 121:6,7 122:6 125:5,23
counsel 101:20 124:25 125:3,5,7,18

counted 22:21
couple 26:25 45:24 59:17 126:24
Court 32:7 71:12
courtesy 66:17
cover 34:16
covered 81:18
COVID 21:11,12
Cox 12:6,11,14,25 13:9, 21 14:20 15:20 16:4,7, 9,14,18,19,21,24,25 37:19 40:15,22 41:5,19 42:11,24 43:5,12,16,17 46:9 47:1,3,4,10,14,15, 25 49:11,22 53:10,18, 23 54:2 57:11,19,21,23 58:3,5,9,16,21 59:6,14, 20 61:12 63:19 64:17 66:4 67:15,17,22 68:24 69:1 75:17 76:14,21,24 77:2,6,20,25 78:12 79:9 80:7,19,20,21,25 81:5, 6,16,19,23 82:6,12,14, 17,19,22 86:14,17 92:5 95:8 104:3,23 107:3,4,7 121:2,9 122:4,13,14,16, 19 123:9 125:9,12
Cox's 81:2
Cox-authorized 79:12
CPNI 82:15
Craftsman 122:8
curious 9:3 54:12
current 34:20 36:2,7,9
customary 87:11
customer 16:9 50:14 63:16,19 64:4,7,9,12, 16,23 65:4,6,11,14,15 66:5,11,16 67:17,22,24 68:1 73:7,9,10,18 80:13 82:7,14 85:1
customer's 15:2 53:4 64:6 65:18 73:14 80:15 109:21
customers 16:11 37:14, 20 63:8 69:3 80:19
cut 15:9 34:10

## D

daily 10:2
DANIEL 126:22,25 127:20 128:13
data 56:20 85:21 96:7
date 9:16 89:24
dates 39:19
Davillier 6:7,14,16,21 7:25 23:6 32:14 44:17 65:20 69:13 71:19

84:10 97:4 98:18 103:5, 9,24 123:25 125:8
day 7:12 12:4,10,12,14, 18 13:1,5,17 14:15 53:8,11,12 55:3,8,17,19 59:5 61:10,11,19 63:6, 11,22 64:20 66:7,20 67:19 68:10 69:10,14 71:22 72:4,16 73:19 84:15,23 85:5 87:20 90:3 92:18 93:8,10,21 105:17 106:18 107:12, 25 117:7 118:10
day-to-day 10:10
days 56:19 69:4 116:17
db 47:22
decal 79:25
decide 63:12 64:7,11 66:1 68:12,20,21
decided 11:3 67:9 109:22
decides 10:25 48:2 66:22 69:16 73:5
decision 11:8,12,15 66:11 69:6 87:23 124:10
decisions 69:9,11
dedicate 40:12
deducted 128:3,8
deductions 127:1,3,5,7, 23 128:1
defendants 6:3,7
defending 71:1
define 9:1 47:16
defines 47:15
definition 9:3 30:16 96:3
degree 75:11
demand 42:24 43:5,16
Dennis 60:15
depend 8:25 42:23
dependent 63:10
depending 10:24 63:5
depends 50:19,22 55:5, 11,22 60:12 64:22 67:11 69:7 87:4 106:20 110:21
deposit 101:22
deposition 6:12 7:5 15:12 31:7 98:12 114:7 128:17
depositions 34:23
Depot 123:2,3
derived 38:4,12,16 39:24 95:9
describing 49:4 52:23
desk 113:13,24
detail 53:16 72:23

**detailed** 30:16
**determination** 96:8
**determine** 34:13 35:2
  87:15 96:22
**determined** 47:18
**device** 95:10
**differences** 105:7
**differently** 99:24
**difficult** 40:3 107:20
**direct** 31:20 61:14,18
  85:16 105:16
**directly** 9:14 31:14
  44:14 91:23 104:4,7
**disagree** 24:19 29:14
**disciplined** 74:5
**disclosures** 88:21,24
**discount** 40:20
**discoverable** 89:4 91:6
**discovery** 98:12
**discussed** 11:16 24:10
**discussion** 11:3
**discussions** 11:13
**dispatch** 10:21 11:24
  12:2,5 14:24 40:21 41:5
  52:22 57:3
**dispatcher** 12:15 13:3,
  19,23 14:16 19:3,4,7,9,
  13,18,19 20:3 41:15
  83:17
**dispatchers** 13:18 40:23
  41:20 53:3 54:18 58:2,3
  84:16 85:7 106:24
**dispatches** 14:20
**dispatching** 57:22
**District** 38:22
**document** 23:16 43:4
  56:14 81:13 86:10
  87:12 93:19 94:2 95:4,6
  101:22 102:3,16,19,20
  103:17 113:10 114:8
  125:1
**documentation** 35:11
  36:20 93:24 95:2
**documented** 35:16,17
  74:13
**documents** 34:7 35:20
  48:9,13,17,21 49:17
  88:12 94:19 101:19
  103:25
**Dollar** 109:3
**Dollars** 109:1
**Dominique** 20:2
**door** 80:1
**download** 105:19
**drafted** 124:25
**driving** 65:16

**drug** 76:19 82:22
**duly** 6:18
**durations** 40:14
**duties** 9:18 10:2 12:3
  36:12,13 42:1 104:18
  126:13

**E**

**earlier** 27:18 28:9 30:5
  62:24 63:1 65:5,7 73:3,
  20 100:10 121:4
**early** 64:13,22 107:12,25
**earn** 108:6,7 109:15
**earned** 100:6,18 102:11
  103:1,10
**ease** 8:9
**easily** 56:23
**educational** 75:4,10
**Eighty** 109:3
**either/or** 29:22
**electrician** 66:14
**electronically** 41:15
  46:25
**eleven-page** 101:21
**email** 50:18
**emergency** 13:15
**employed** 90:14 127:6
**employee** 20:1 30:17
  89:13 126:10
**employees** 17:9 18:1,3,
  8,10,13,18 20:5,7,15,24
  22:2,8,22 23:7,10,23
  24:15 25:9,13,24 26:8,
  19 27:4,15 28:4,8,11,16
  29:8,11,20 30:19 32:18
  33:1 34:19 43:20 53:11
  124:12,21 127:2
**employment** 42:19
**engage** 44:22 45:10,15
**engaged** 45:22 46:6
  123:5
**engagement** 43:19
  75:23
**engages** 43:22 45:5
**engaging** 43:20
**entail** 86:15 126:13
**enter** 12:5 14:22
**entered** 104:25
**entities** 16:10,13,21
  57:20
**entity** 58:17 60:16
**equipment** 12:7 14:22
  15:2 40:25 41:14 49:14
  53:4,5 54:22 55:4,7,10,
  16,24 56:17 77:21
  78:18 84:24 93:16 94:1

118:19,24 119:18,19
  120:4,7,10,14,21
**equipment's** 119:24
**errands** 116:23
**essentially** 15:18
**estimate** 119:13
**ETA** 61:13,18 105:16
**etcetera** 46:14
**evaluated** 109:21
**evaluates** 73:4
**event** 87:2
**everything's** 41:16
**exact** 21:16 89:24
  111:16,25
**EXAMINATION** 7:4
  126:25
**examined** 6:18
**Excel** 95:3
**exceptions** 45:14
**exclusively** 16:18
**Exhibit** 101:21 113:9
  114:10
**exist** 41:23 42:3 105:7
**existing** 44:20
**expect** 63:4 64:17 66:15
  81:16
**expectation** 81:3
**expectations** 81:6
**expected** 47:13,15
  65:21 67:16,25 80:22
  81:23
**expecting** 63:15,17
  80:16
**expenses** 34:17 35:17
**experience** 45:6,11,16,
  21 46:5 75:13
**experienced** 44:22 49:2,
  7 50:4
**explain** 34:23 114:21
  116:7,9
**explained** 72:22 112:8
**extent** 73:11

**F**

**fact** 102:10 116:25
  117:12
**failed** 87:3,6 98:7
**failing** 74:6
**fair** 7:21 21:20 45:18
  81:1,17 100:7 124:9
  125:10,13,22
**falls** 107:6
**false** 28:17 29:9,15,18
  30:2
**familiar** 7:8 15:23 51:18
  85:18

**fan** 70:4
**federal** 25:8,12 26:7,19
  27:3 28:4,15 29:18,24
  30:17 32:25
**feel** 73:15
**fell** 14:14 106:17
**felt** 7:20
**field** 41:10,12 42:2,11
  44:25 46:8 51:14,19
  52:11 76:24 77:6 79:18
  81:4
**fiftieth** 87:25
**figure** 18:7 23:19,22
  31:16 35:23 95:14,21
**file** 101:14 103:21
**fill** 24:7
**filled** 23:15 25:22 26:25
  28:11
**find** 9:5 12:24 13:2
  20:18 23:9 44:16 45:5
  54:12 56:11,12 91:8
  120:10
**fine** 14:8 15:11 29:3
**finish** 13:16 15:15 53:7
  64:24,25 65:1 109:17
  111:17 112:1
**finished** 15:13 107:11,
  25 108:15,17 109:8,14
**finishes** 63:9 75:9 110:9
**firms** 89:18
**fit** 24:5 47:13 67:8
**five-minute** 113:21
  126:3
**five-page** 113:10
**floor** 96:18 97:1
**Flowers** 18:19 19:5,6
**fluctuate** 21:7
**focus** 42:13
**follow** 63:24 66:6 81:16,
  23 86:8 126:24
**followup** 126:8
**form** 12:20 14:1 22:25
  23:12 33:3,10 45:2 50:7
  54:4 56:7 60:19 62:19
  72:18 74:9 81:9 86:5
  87:8 88:3 90:11,20
  94:23 108:21 118:12
  120:16,23 123:11
  124:23 127:19
**formal** 37:5 39:9 80:15
**format** 35:14
**formula** 35:1,8 87:24
**foundation** 67:23 97:24
  98:8
**fragmented** 64:1
**frame** 16:5 17:12 34:21
  97:18

**free** 58:6 60:24 66:23
  68:14 69:9,13 82:24
**friend** 83:9
**front** 26:10 31:2 40:5
  97:20 101:20
**froze** 51:3
**FSA** 48:11 80:5 81:13
  86:9 125:19
**fulfill** 42:10
**full** 107:25 108:18
**function** 83:18 122:6,9
**funds** 25:10 36:1

**G**

**gain** 25:9
**gather** 56:25
**gathering** 118:3,9
**gave** 19:14,20 26:13
  112:7
**gears** 92:16
**general** 13:9,11 22:14,
  17,19 24:11 26:15
  40:15 43:24 44:8 45:7
  50:11 52:18 55:23 69:5,
  8 77:14,24 81:25 87:4
  91:3 107:18 111:21
  112:11 115:18 118:20
  122:5 127:7,8
**general,--** 44:8
**generally** 44:9 81:22
**generate** 40:24
**generated** 12:13 95:12
**give** 7:19 8:18 9:2 32:21
  34:14 73:12 112:12
  114:15 126:1
**giving** 22:13
**goal** 55:12 66:5 73:9
**good** 6:21,23 32:4 40:21
  43:7
**Government** 25:8,13
  26:7,19 27:3 28:4,16
  29:19,25 32:25
**grab** 113:23
**grabbing** 114:3
**graph** 114:19,23
**Grayco** 90:7,9,15,16
  91:12,19,25
**Gretna** 6:17 7:25
**Group** 6:8 125:8
**guarantee** 86:1
**guess** 14:4 23:5,19
  36:10 39:9 41:4 44:16
  46:3 56:11 81:15 84:24
  89:16 121:23
**guidelines** 23:4,16,21
  24:5,11 25:16,21 28:22,

23 33:14 34:1 79:9
81:17,19,20,24 96:24
**Guys** 83:22

---

**H**

**half** 83:23
**hammer** 121:17
**Hancock** 36:17,21
**handed** 119:24
**handle** 55:16
**handled** 106:23
**handles** 11:24 13:12
14:20
**handwriting's** 19:23
**happen** 7:11 52:5 53:13,
15 54:12 66:7 87:2
106:17,21 119:5
**happened** 64:4 72:8,12
96:22 123:19
**happening** 122:21
123:14
**Hayes** 6:20,24 7:1,4
12:22 14:3,6,13 23:1,13
24:2,4,22 25:2,14 26:22
27:20 28:6,20,25 29:5,
16 30:10,21,25 31:10,
18,23 32:6,11,13 33:4,
11,15,18,24 35:6 36:6
38:9 44:6 45:3 50:8
51:2,5 54:5,16 56:8
57:7 60:1,9,21 62:20
67:2,4 68:3,7,18 69:22
70:6,15,20,24 71:6,18
72:7,9,13,19 74:2,10,24
75:8 77:12 81:10 82:5
83:4,21 84:4,7,9 86:6
87:9 88:4,13,18,20,25
90:12,21 91:2,15,22
92:3,9,14,22,25 93:3,6
94:24 95:18 96:1,17
97:9,25 98:10,15,24
99:6,16,19 100:11,21,
24 101:8,11,18 103:16,
18,23 105:12 106:1,8,
15 107:2,15 108:11,22
111:11 113:14,18,25
114:5,12 116:20 117:4,
16,20,22 118:6,13
119:2,8,16 120:2,17,24
123:12,17,22 124:7,15,
24 125:17,25 126:6,18
128:15
**HD** 8:3,6,8,9,12,16 9:5,
16,24 10:13,16,19,25
12:9 13:2,19,22,23
14:16 15:7,18 16:2,10,
17,24 17:4,10,19 18:2,8
20:16,19,25 21:21,25

---

22:3 28:13 30:1 33:1
35:11,20 37:1,10,14
38:1,4,13,15 39:6,24
40:18 41:22,25 42:3,9,
21 43:1,15,19,22 44:1,
18,22 45:5,10,15,17,22
46:6 47:9 48:17 53:9,11
54:1,13,21 56:3,14,15,
21 58:17 59:15 60:17,
22,23 61:2,4 71:20
72:2,14 73:21,23 74:5,
16 75:5,16,24 76:7,18,
23 77:5,9 78:5,10 79:3,
7,20 81:5,15,22 82:2,10
83:1,12,17 84:12,16
85:14 86:1,11,19,23
87:11,12,15,24 88:22
89:5,13,21 90:6,8,16
91:6,9,11 92:16 93:7,19
94:3,12,18 95:7,13,20
96:6 99:10,13 104:1,9,
14 105:1 106:23 107:23
108:12 109:4 118:17
120:19 124:19 125:9
126:11 127:6,15 128:8
**HD's** 48:23 51:18 74:13
104:6
**HDA** 115:1,22
**head** 21:17 35:10 74:12
**heading** 114:20 115:1
**heard** 6:25
**hearing** 59:23
**held** 123:7
**Hey** 64:12 113:15
**high** 75:9
**higher** 21:10
**highly** 27:25 30:15
**highly-skilled** 74:21
**Highway** 6:17 7:25 55:1
**hire** 82:1,17,18,24
**hired** 42:15
**historical** 85:20
**history** 76:16 94:8
**hold** 8:6,12 50:17 69:19
113:12 114:24
**home** 53:4 64:4,9 65:5,
15,18 80:11 82:14 85:2
108:2 123:2,3
**honest** 21:16 22:12
53:17
**honestly** 44:13
**hour** 83:23 102:25
118:21 119:11
**hourly** 20:9,20 97:5
98:21 99:2 102:7,24
103:13
**hours** 92:17 93:8,20,22,
24 94:3,20 95:14,22

---

96:12,13 99:11,22
100:6,17 101:3 102:4
103:12 108:18 109:17,
20 110:10,20 111:7
112:2 113:4 114:20
115:7,25 116:4,15
**house** 49:12 52:20
63:16,18 66:14 109:21
110:19
**housed** 54:22
**household** 45:20
**hundred** 37:23 38:12
**Husky** 122:8
**hypothetical** 67:7
111:21

---

**I**

**ideally** 63:3
**identified** 20:15 40:1
90:6,7
**identify** 100:15
**ignore** 66:24
**imagine** 7:12 121:19
**impact** 47:24 50:14
**important** 41:2 57:16
**imposed** 107:23
**in-person** 46:11
**inception** 9:16,19,24
11:2 99:13 125:12
**include** 12:3 22:17
23:20 28:10 32:18
105:9 118:2
**included** 23:9,22 24:5,
15 34:2
**including** 125:21
**income** 38:3,12,15
39:24 40:24 41:1
**indefinite** 42:21
**independent** 17:20 18:3,
6 21:3 22:21 25:5 28:1,
14 30:1 32:17 33:7,20
43:20 69:1 123:7
124:11,20 126:10,12
**individual** 39:16,25
46:17 48:3,4
**individually** 56:24
**individuals** 32:16,19
39:23 85:17 89:3 91:9
106:3
**industry** 11:4 75:19
**inform** 50:14
**information** 12:6 14:22
17:11 25:16,18 26:6,10
33:8 40:5 47:1,5 49:24
51:10 56:25 57:1 74:12
76:11,13 85:19 89:4
91:4,5,6,8 93:1 94:13,

---

17 95:7,9,12 97:17,20,
22 120:10
**initial** 11:13,14 63:2
88:21,24
**initially** 12:25
**inserting** 112:10
**inside** 92:5
**inspect** 86:17
**install** 77:25 112:24
122:18
**installation** 38:20,24
77:20 86:2 112:25
113:3,6 123:8
**installer** 112:23
**installs** 37:20 54:22
**instance** 56:12 109:7
**instances** 111:13
**instruct** 14:9 59:20
**insurance** 128:7,8
**integral** 37:10
**intends** 90:8,16 91:9
**intent** 91:3
**interact** 53:3
**interpretation** 33:25
**interview** 76:3,5
**introduce** 6:25 80:12
**inventory** 55:14 56:9
**invested** 104:1
**involve** 38:20,23
**involved** 27:23 60:17
104:16 106:3
**involves** 40:22
**Irrespective** 23:21
**issue** 51:15 75:20
**issues** 15:3 126:17

---

**J**

**J.W.** 104:10,11,13
**January** 17:8,23
**job** 8:6,11 9:18 10:2
12:1,3 14:15 15:1,5
19:2 36:12,13 41:13,25
43:7 44:25 59:2,4,12
62:25 64:3,8,14,22
65:2,9,22 66:23,24
67:10,11,13 68:5,15
71:21 72:3,15 73:5,8
75:2 77:8 82:16 83:11
86:2 87:3,19,25 88:7
92:21 93:15 95:11
100:18 101:5 104:18
107:9 108:15,16 109:8,
9,12,14,18 110:7,9,12,
18,20,22,25 111:4,5
112:1,3,24 113:2
115:14,16 116:10,13

---

121:11,13,17 122:4
126:13
**job's** 64:9
**jobs** 12:13 41:11 47:12
53:22,24 54:2 56:1
62:23 63:2,9 64:16
66:21 78:11,20 83:1,7,
10,14,16 87:13,15
92:20 93:10,12 94:1
105:16,23 107:11 108:8
116:22 117:1,6 121:2,9
123:9
**Jody** 18:19 19:2
**John** 6:14,16 7:25 103:5
**jointly** 32:2
**Jonathan** 6:6 14:7 71:2,
10 88:14 97:11 113:15
**Jonathan's** 70:7 71:8
**juggle** 65:10
**jumping** 71:9
**June** 9:17
**Justine** 126:21

---

**K**

**Keshia** 18:20 19:4,15,
16,17
**kind** 22:13 41:17 42:23
46:13 47:3,4 64:1 66:17
76:15 80:5 111:20
119:9 126:14 127:10
128:9
**knowledge** 91:18 104:4

---

**L**

**labor** 38:17 40:19,21
41:6,22 42:11 43:6
125:10,13,22
**laborers** 74:21
**lack** 48:25 98:7
**Larry** 126:8
**late** 108:6
**latitude** 64:21
**Law** 6:8 125:8
**lawsuit** 36:14 37:9 38:5
42:14,15 104:17,23
105:8 106:4
**lawyer** 42:20
**lay** 97:24
**laying** 98:8
**lead** 9:8 46:12 51:16,20,
22 52:4,6,21 86:24
88:10 126:9,15
**leading** 49:12
**learn** 47:3
**lease** 79:4 127:17,22,24

**leased** 109:4
**leases** 127:10,14,17
**leave** 13:15 53:6,7
**leaves** 114:7
**left** 32:14
**legal** 30:16
**level** 53:16 72:22
**levels** 47:22 49:12,13
**Lewis** 6:5,6 12:19 13:25
  14:11 22:24 23:11,25
  24:17,24 26:20 27:16
  28:18 29:12 30:3 33:2,
  9,22 35:4 36:4 38:7
  44:4 45:1 50:6 54:3,14
  56:6 57:5 59:24 60:7,18
  62:18 66:25 68:16
  69:20,24 72:5,17 73:25
  74:8,22 75:6 77:10 81:8
  82:3 83:2 84:2 86:4
  87:7 88:2,15,23 90:10,
  19,25 91:13,20 92:1,7,
  12 94:22 95:16,24
  96:15 97:7,14 98:5,22
  99:4 100:8 101:6
  103:14 105:10,24
  106:6,13,25 107:13
  108:9,20 111:9 113:11,
  16,22 114:2,7,9 116:18
  117:2,14 118:4,11,25
  119:6,14,25 120:15,22
  123:10,15,20 124:5,13,
  22 125:15 127:18
**likewise** 105:5 109:17
**limited** 13:6,7,14 52:24
**lines** 79:14
**list** 77:8,15,24 78:2,4
  121:5,9 122:2
**listed** 27:15 90:23
**litigation** 36:3,8
**LLC** 8:3,7,8
**loan** 21:21,25 22:3,22
  23:3,8,10,15,22 24:6,16
  25:15 26:1 28:12 32:16,
  19 33:8,21,25 34:15,16
  35:3,12,21 36:17 37:2
**located** 104:11
**location** 15:5 67:12
**log** 61:17,18 105:15
**logged** 115:13,14,16
**logo** 79:12,16,22 80:6,7
**long** 43:11 46:16 58:7
  82:6 104:13 118:8
  120:12 121:13
**longer** 46:18 48:23
**Lonnie** 56:13
**looked** 35:19
**loop** 60:23 61:3

**lot** 13:20 44:20 75:12
  107:19
**Louisiana** 6:4,8,17 8:1
**lunch** 83:24 116:14,16,
  23 117:1,6,12,19

**M**

**Madame** 32:7 71:12
**made** 11:7,12,14 36:16
  41:19 87:22 96:2
  124:10,19 125:9
**Magistrate** 27:23 29:3
  30:8,20 31:9,13,17 32:1
**magnetic** 79:25
**maintain** 35:11,20 49:14
  54:21 55:15 56:20
  75:24 79:16 93:19
**maintained** 25:4 27:25
  54:23 95:4,7,8
**maintains** 10:18 37:1
**majority** 16:19 40:18
  45:13 57:11 75:22
**make** 10:4 37:5 47:24
  48:20 49:12 50:24
  53:19 54:13 55:24
  65:12,17 66:11 68:22
  69:5,9 86:17 96:7,12,
  19,25 115:19 125:18
**makes** 51:11 107:18
**making** 27:7,11 41:16
  49:9,15 70:12 71:4,15
**manage** 9:21 10:4,5
  55:14
**management** 11:3,7,12,
  16,17 75:3 85:7
**manager** 8:13,22 9:1
  10:8 12:2 51:13
**managers** 8:15,23 9:6,9
**managing** 9:20,23
**manner** 97:23 124:1
**mark** 71:12
**marked** 101:21
**marketing** 123:6
**materials** 46:22 48:7
  118:3,10
**matter** 7:3 54:10 90:18
  107:16 110:8 111:5
  113:9 124:3
**means** 13:14 14:25
**meet** 50:3 67:21 73:9
**meeting** 50:17,25 51:1,
  6,7,9 67:24 68:23,25
  69:2 82:11
**meetings** 50:20
**meets** 86:17 122:5
**member** 8:2 9:4,21

**members** 9:24
**mentioned** 128:2
**messages** 85:16
**met** 43:11,16 48:5 49:16
  82:6 97:1 121:10
  125:19
**Metairie** 104:12
**method** 49:22 105:4
**mind** 107:23
**mine** 83:12
**minimum** 97:2
**minute** 16:24
**minutes** 83:25 109:9,14
  110:9 111:6 112:1
  113:4,19,24 118:20
  119:10 126:2
**Mischaracterizes** 27:17
  30:4 100:9
**missing** 55:11,20 116:8
**mix** 66:2
**model** 91:11,12,17
**modems** 78:24
**modify** 66:9
**moment** 39:14
**money** 32:21 34:4 35:2,
  12,15 102:11 104:1
**monitor** 53:16
**months** 26:25
**morning** 6:21,23 12:12
  53:22,25 119:23
**motion** 101:14 103:21
**Move** 71:17
**moving** 64:22
**mute** 31:11
**mutually** 60:3

**N**

**name's** 103:5
**named** 20:4 127:2
**names** 8:18
**nature** 42:22
**NCT** 75:17
**necessarily** 52:3 109:20
**needed** 58:7 77:8 84:25
  85:11 93:22 109:22
**Netchex** 89:17
**network** 47:25
**non-** 122:3
**non-approved** 121:1
**non-cox** 57:4
**notes** 126:2
**notify** 52:22 73:23 108:1
**notifying** 83:1,12
**number** 18:13 21:7,10,
  13 22:8,15 23:20,23

  25:23 26:13,14,16
  31:20 32:16,19 42:25
  46:2 51:23 54:17,20
  56:3,12 89:2,6 90:5,14,
  24 93:8 96:13 102:3
  116:2,4 127:8
**numbers** 21:16 22:13

**O**

**object** 22:25 23:12 29:1
  33:17 38:8 42:20 68:4
  71:7 72:10 81:9 92:23
  93:4 99:17 100:22
  118:12
**objected** 70:21
**objecting** 70:8 71:8,9
**objection** 12:20 14:1
  24:1,18 26:21 27:17
  28:19 29:13 30:4 33:3,
  10,23 35:5 36:5 44:5
  45:2 50:7 54:4,15 56:7
  57:6 59:25 60:8,19
  62:19 67:1 68:17 70:23
  72:6,18 74:1,9,23 75:7
  77:11 82:4 83:3 86:5
  87:8 88:3 90:11,20
  91:1,14,21 92:2,8,13
  94:23 95:17,25 96:16
  97:8,10,11 98:4,6,7,23
  99:5 100:9 101:7
  103:15 105:11,25
  106:7,14 107:1,14
  108:10,21 111:10
  116:19 117:3,15,21
  118:5 119:1,7,15 120:1,
  16,23 123:11,16,21
  124:6,14,23 125:16
  127:19
**objections** 70:4,12 71:4,
  16
**obligation** 68:2 69:3
  102:18
**obligations** 42:10
**obtain** 75:15 79:20
  85:21
**occasion** 45:15 54:11
  58:11,23
**occasionally** 48:13 55:5
  62:13
**occasions** 59:19
**occur** 15:3
**occurred** 124:3
**offer** 80:24
**offhand** 17:12 26:6 34:6
  116:21 123:13
**office** 59:5 108:1
**one-hour** 117:6

**ongoing** 43:15
**online** 46:10,21,24 48:7
**open** 93:12,15
**opened** 92:21
**opening** 92:19
**opens** 93:9,25
**operate** 11:5
**operation** 67:23
**operational** 10:12,16,18,
  24
**operations** 37:12
**opinion** 16:2,24
**opportunity** 40:11 108:6
**opposed** 30:18 98:21
**opt-in** 7:2 105:9
**option** 44:11
**order** 15:4 62:16,22
  63:3,9,12,23 65:8,10
  66:2,10 75:15 97:18
  106:11
**orders** 106:18
**organizational** 39:9
**originally** 12:18
**Orleans** 6:8,14
**outset** 105:17

**P**

**P.M.** 128:17
**paid** 11:1,9 20:9 34:8
  35:12,15,19,21,25
  91:19 96:3,5,20 97:5
  98:20,21 99:2,3,13,21,
  23 100:2,5,16,17,19
  101:3,4,9 102:8,19,21,
  24,25 103:3,10,11
  105:4 108:25
**pandemic** 21:14
**paperwork** 24:7 25:22
  26:25 29:7,25
**paragraph** 114:13,20
**part** 34:17 36:14 37:9,
  10,11 41:13 42:14,15
  53:1 55:13 98:6 110:16
**party** 59:18 60:10
**passing** 82:21
**past** 8:14,24 44:12 89:21
**pause** 15:13
**pay** 20:19 34:4,17,18
  41:11 78:7,25 99:10
  100:1 102:4,8 128:8
**paycheck** 127:3
**paychecks** 17:3 127:5
**Paychex** 89:17,25
**paying** 97:1 99:11
**payments** 41:19 127:10

**payroll** 22:14 89:12,18, 22 90:2
**pays** 20:19
**PDF** 48:9,13,17 49:17
**people** 10:5,9,15 20:4, 15 21:2,17 22:18 24:15 25:9,12 26:5,18 27:2,14 33:1 44:23 54:17,20 91:5 94:25 126:17 127:6,15
**percent** 37:23 38:12
**percentage** 40:21
**perform** 41:25 59:22 67:16 68:9 75:2 80:22, 25 83:18 86:23 87:16 104:2
**performed** 38:4,13,25 39:3,13,18,24 58:17 83:12 86:3,12,14,20 102:11 104:13 113:3
**performing** 109:24
**performs** 104:8
**period** 24:20 38:21 39:21 42:16 102:5,8
**periodically** 86:20,22
**periods** 94:11
**permissible** 82:25 122:3
**permitted** 80:17,23 121:1
**person** 10:21 20:3 35:9 39:4,12 51:17 52:4,9 59:9 74:17 82:19 87:18, 22 126:15
**ph** 10:20 18:23 19:11 20:2 52:8 89:9
**phone** 29:3 31:19 66:17 126:21
**physically** 41:14 68:9
**pick** 55:4,9 63:23 66:21 78:18,19
**picked** 93:16
**picks** 94:1
**piece** 99:12
**pieces** 41:17
**place** 10:5 47:23 67:15
**places** 16:16
**plain** 29:23
**plaintiffs** 7:2,3 105:8,9
**plan** 91:11
**plenty** 116:23
**pocket** 122:18
**point** 7:13 16:17 46:15 63:20 64:15 68:24 71:13 97:5 98:21 99:3, 12,23 101:13 105:7 108:25 109:2,3,4 119:21 128:10

**points** 100:6,18 101:4 103:1,10 108:17 109:8, 13,15,18,25 110:8,11, 21 111:5,8 112:3 113:1, 5 128:9
**points-based** 102:12,17
**policy** 76:21,23 77:5
**poor** 7:10 38:11
**poorly** 7:14
**poorly-worded** 18:12
**populated** 61:19
**portion** 14:17
**position** 71:15 89:5 91:7 119:4 124:4
**possesses** 79:21
**possession** 48:17,23 94:19
**Possibly** 107:3
**Post** 85:11
**potentially** 54:8 109:24
**PPP** 21:21,25 22:3,22 23:3,7,10,15,22 24:6,7, 16,19 25:10,15,22 26:1 28:12,23 29:7,25 32:15, 19,21 33:8,13,21 34:4, 15,16 35:3,12,21,25 36:17 37:2
**practice** 54:10 107:16
**practices** 43:19 107:22
**premises** 82:8
**present** 17:19,24
**preserve** 37:4
**Preston** 7:1 24:18 30:7 69:19,21,25 70:3 113:12 114:10
**pretty** 13:10 18:16 43:24 50:10,11 53:18 75:19 104:20 112:11 117:9
**previous** 45:6,7,11 75:23
**primarily** 11:14 76:15
**primary** 15:1 49:21,22 57:12,13,15
**problem** 51:15
**problems** 52:19
**procedures** 107:23
**proceeding** 25:4
**proceedings** 26:3 28:1
**process** 10:6 13:11 46:16 48:6 49:3 50:18 76:3,6,12 87:22 108:2
**processes** 89:12,18,22 90:2
**produce** 56:22 57:1
**product** 49:25
**profit** 42:1

**project** 16:15 39:4,17,18 40:2,13,22 57:13,23,24 58:3 59:14 60:17,22,24 61:5 67:20 111:17,18 112:23 116:5 122:12,15
**projects** 9:21 10:3,4,7 15:25 16:4,7 17:1 38:18,19,22 40:10,14 57:23 58:2,5,18,20,22, 25 59:1,8,20 60:14 61:2 104:23
**proper** 15:2 70:9,11
**property** 82:15
**provide** 15:24 16:3,25 37:14,23 49:24 80:17, 18 86:12
**provided** 37:24 46:7 77:9,16 78:12 79:1,2 81:7 96:7 113:9 121:5 122:16,19
**providing** 12:8 15:19 128:11
**pull** 56:16
**purchase** 78:4,6 127:16
**purchased** 78:10
**purpose** 15:1 55:25 82:16
**purposes** 105:20
**put** 47:23
**puts** 40:25
**putting** 41:14 49:10 112:15

**Q**

**QC** 86:12,14,20,23 87:3, 6,16,17,19,25 105:22 106:4
**QC'D** 87:13
**qualifier** 112:15,16,17
**quality** 86:1,11
**quantifier** 112:5
**question** 7:11,13,16,19 12:20 14:1,14 15:14 18:6,12 20:10 22:25 23:12 24:3,14 26:5,11 27:1,5,6,7,14,22 28:9, 21 29:6,22,24 30:16 33:3,10,16,19 34:12,13 35:1 36:10,24 38:11 40:4 41:4 42:9 44:7 45:2 46:4 50:7 52:16 54:4,9 56:7 57:8,25 58:1,10,14 60:19 62:19 63:21 64:1 68:6,8,10 69:8,15 71:19,23,24 72:1,18,24 74:9,18 76:1,4 81:9 86:5 87:8 88:3,6 90:11,20 93:7,18

94:23 95:5,19 97:12,15, 16 98:8,9 99:7,8 100:4, 13,14,25 101:15,17 103:9,20,22 104:19 107:17 108:21 110:1,3, 4,6,14 111:23 112:9,17, 19 118:12 120:16,23 121:16,22 122:10 123:11 124:23 125:1 126:7 127:19
**questioning** 83:23
**questions** 14:10 25:20 32:15 126:20,24 128:14
**quickly** 19:1 108:16

**R**

**random** 66:13
**range** 97:17
**rate** 99:12 102:7,25 103:13
**re-ask** 18:12
**ready** 31:9 32:10 114:18
**rearrange** 53:23
**reason** 50:1 65:25 68:11 95:21 96:25 112:15 119:21
**reasons** 67:9
**reassign** 12:16 13:4,18 83:15 107:4,5,8
**reassigned** 13:24 14:17 106:19
**reassignment** 106:23
**reassignments** 13:13
**recall** 9:16 17:14,15 24:10,11 44:13
**receive** 17:4 43:7 49:19 61:10 109:1,9,11,18
**received** 32:22 40:18
**recent** 22:14
**recollection** 22:14
**record** 7:1,24 8:7 32:5,8 71:13 84:6,8 103:4,7 120:19 126:5
**records** 22:12 36:25 37:1 74:14
**Recovery** 38:22
**recurring** 94:5
**refer** 8:8 21:18 34:7 48:7 81:12,19 86:8,9 99:14 101:19 103:2,17 111:19 123:24
**reference** 8:9
**referenced** 39:13 46:19, 21 75:25 76:4
**referrals** 44:19,20
**referring** 11:18 48:22 81:21 102:17 103:6

**reflect** 102:3,7,10 103:5, 25
**reflected** 104:6
**reflects** 102:19 116:2,3
**refrain** 42:18
**refute** 124:4
**regulations** 7:8 23:14 81:6 82:15
**reimburse** 41:19
**related** 24:21 50:12 85:4 94:15 126:7
**relevance** 25:1,3
**relevant** 25:11 26:2 27:25 34:20
**relied** 124:25
**remember** 18:20 21:23 22:2 39:19,20 89:24 92:4
**rent** 79:4
**repair** 86:2
**repeat** 12:23 45:4 127:21
**rephrase** 7:15 14:2,4 45:10 121:22
**report** 51:14
**Reporter** 6:10 32:7,9 71:12
**represent** 7:2 28:7
**representative** 90:6,7
**represented** 22:3,9 25:8 28:3,15 29:7,24
**representing** 32:25
**represents** 23:8 115:20, 25
**request** 37:5
**requested** 25:19 59:10
**require** 75:17 76:11
**required** 10:11 25:18 34:1 50:20,25 51:6,9 75:15 76:18 77:20,25 79:6 80:4 85:23 105:15, 19 107:10 108:1 112:23 127:14
**requirement** 67:18 75:11 76:14 77:3
**requirements** 42:24 43:12,17 67:22,24 68:1 73:9 75:4 79:10 82:6,12 86:9 121:11 125:14,19
**requires** 47:9 82:23 121:17
**reschedule** 73:18 74:3
**reserve** 101:13 103:20
**residence** 6:3
**residential** 37:20 38:20
**resolution** 73:7

**resources** 40:12
**response** 125:2
**responsibilities** 9:12
**responsibility** 55:14
**responsible** 12:8 63:7 92:19 127:12
**responsiveness** 29:2 33:17 68:5 70:21 72:11 92:24 93:5 99:18 100:23
**result** 15:4 21:13 38:4, 13,16 40:19
**resume** 83:25
**retained** 85:13
**retry** 99:9
**return** 94:14 104:6
**returns** 114:7
**revenue** 40:18
**review** 96:6,11 101:25 113:20 114:15
**ride** 49:2
**ride-along** 49:18
**ride-alongs** 49:1
**Ridge** 6:4
**rights** 101:14 103:21
**River** 6:3
**role** 41:2
**rolls** 49:22
**roughly** 20:24
**route** 13:12,23 14:15,17, 25 55:3 61:11 62:3 63:11,13,22,25 65:10 66:20 67:19 68:10,13 74:7 83:9,10 107:12,25
**routed** 64:20
**routes** 12:9,11,12,16 13:1,4,10,17 22:15 53:10,12 56:1 61:19,23, 24 62:12 83:1
**routing** 61:9
**rules** 7:7 34:23 81:6
**run** 48:2 116:23

**S**

**safe** 73:16
**salaried** 20:5,21
**Salary** 20:22
**scenario** 60:12 69:7 73:23 81:12 87:4
**scenario's** 81:18
**scenarios** 107:20
**schedule** 59:11 63:8,25 64:20 66:13
**scheduled** 62:23 63:1
**scheduling** 57:3,22

**school** 38:22 75:9
**scope** 13:6,7 97:18 110:7,10,16 111:4,14, 15,23,25 112:10,21
**Scott** 18:21 19:11
**screen** 76:19
**screening** 71:1 82:22
**screwdriver** 121:18
**secondary** 57:15
**seek** 24:9
**send** 49:23 86:16 91:16
**sends** 80:20
**sense** 51:11 121:19
**serve** 41:1
**server** 85:15
**serves** 122:5,8
**service** 17:1 41:10 46:9 58:22 59:1 67:17 73:10 76:24 77:6 79:18 81:4 100:19
**serviced** 104:23
**services** 37:13,16 38:1 39:13 80:17,18,24 104:2,8,14
**servicing** 69:3 123:8
**set** 11:15 18:15 31:17 34:16 41:7,10 43:12 53:22 124:18
**sets** 53:10
**shadowed** 46:12
**shirt** 80:7
**short** 83:24
**show** 56:15 60:3 74:6 87:13 94:20 110:19 120:19
**shows** 35:21 94:8
**shut** 31:6,7
**sic** 102:21
**side** 10:8
**sign** 79:15 85:23
**signage** 79:6,9
**signs** 95:10,11
**similar** 57:23 104:17 105:2,5
**simple** 50:23
**simply** 16:3 72:15
**sir** 6:11 18:5 26:4,9 29:6, 21,22 33:16 79:23 84:11 100:12 102:1 108:13 120:12
**sit** 26:17 27:1 97:3 98:19 103:24
**site** 110:25 112:24
**sitting** 105:13
**situation** 13:15 52:22,25 67:7 110:2 111:21

**situations** 45:20 72:20, 21 112:13,14
**skill** 48:4 75:3
**Slack** 84:12,14,16 85:8, 10,15,18,24 105:20
**slot** 62:2,6,15 66:1,23 83:11 108:19 109:8,12, 13 111:24
**slots** 61:24 62:1
**smaller** 46:2
**sole** 9:4 39:12
**solicit** 44:2
**someone's** 82:13
**sort** 11:2
**Sounds** 32:4
**spar** 110:5
**speak** 15:8
**speaking** 70:4,12 71:4, 7,15 81:22
**special** 77:25
**specific** 35:8,14 42:16 55:23 57:1 69:7,15 73:13 74:11 75:10 80:11 81:11,13,18 84:24 97:21 110:2 111:19 120:18
**specifically** 24:12 39:19 43:3 58:9 87:19 117:17 118:18 119:3
**speculate** 26:23
**speculation** 26:21 44:5 97:16
**spends** 118:9
**spent** 118:2,16
**spoke** 73:3
**spoken** 91:24 92:5
**spreadsheets** 95:3
**Sprint** 16:15
**staff** 15:19,24
**staggered** 61:23
**stand** 124:2
**standard** 47:4,15 48:5 49:11,13,15,25 50:12, 13 75:19 87:11
**standards** 43:12 47:2,3, 10,14,20,21 48:1,2 49:9 50:2 86:18 125:10,13, 23
**stands** 119:9
**start** 7:23 15:14 17:9 53:22 63:3,4 64:3 114:21 115:7,15 116:4, 9
**start/stop** 118:1
**started** 16:14 18:17 19:14 44:14 53:25 55:2 94:9 104:15 116:10

120:9
**starting** 63:20
**starts** 89:3
**state** 7:23
**stated** 96:4
**statement** 29:14 81:17
**stay** 18:15 107:10
**stays** 111:16
**Stephen** 8:20 10:8,20 11:18,20 52:8,10,12,16 54:19 59:16 76:9 85:8 87:1 96:8
**stipulates** 100:1
**stock** 55:25
**stop** 7:15 15:15 24:25 31:12 70:12 71:15 114:21 115:7 116:4,12
**stopped** 116:12
**stops** 66:10
**strike** 38:2 51:12
**structure** 11:4 39:9 51:18 124:18
**stuff** 53:8
**subject** 68:19 77:13 105:22 106:4
**submission** 33:21 34:3
**submitted** 25:16 29:15 33:12,25 36:21 37:2 48:19 93:24 94:13
**subpoena** 36:25
**substantially** 104:17 105:1,5
**suggest** 103:3
**suit** 127:2
**supervising** 46:13
**supervisor** 51:13
**supervisors** 10:23
**support** 89:5 91:7 127:9
**Swafford** 89:9,10 90:1
**swap** 82:25 83:6,10
**swapping** 64:16
**switch** 89:24
**Switching** 92:16
**switchover** 89:23
**sworn** 6:18
**system** 12:6,11,14,25 13:9,12,21 14:21,23 53:18,23 54:2 93:13 95:8 97:6 99:12,23 102:12,18 105:16 107:4,7 108:25 115:13 128:9

**T**

**table** 71:24 72:25 115:2, 3

**takes** 111:17 119:10,17
**taking** 108:8
**talk** 9:15 16:23 43:18 47:20,25 51:17 52:9,12 61:9 76:8 84:5 88:11
**talked** 48:25 49:17,18 117:11
**talking** 16:5 30:12 34:21 39:22 47:20 48:1 59:4 61:1,2 67:6 94:10 110:6 111:20 115:2
**targeted** 97:22 98:9
**task** 10:24
**tasks** 10:10
**tax** 104:6,8,13
**taxes** 128:3
**Taylor** 94:15 101:23 102:4,8,11,21 103:6,10 114:25 116:16 117:11
**team** 11:7,12 85:7
**tech** 49:19,21 99:10 110:9
**technical** 45:8,21 47:21 48:1 50:12,13
**technician** 10:7,23 13:22 14:14,16 15:4 34:14,17 35:3,13 37:11 38:16 40:19 41:14,22 42:11 43:6 45:22 46:6 47:18 48:2,4,5,6 49:1,3, 7,8 51:20,22 52:4,6,12, 18,21 55:18 56:4 57:2 60:6,11,15 61:4,10 62:14,21 63:7,10,11,22 64:2,11,15 65:3,9,25 66:6,8,12,20 67:9,25 68:11 69:16 71:21 72:2, 15 73:4,16 74:5 75:5,16 76:5,6,7,12 77:16 78:17,25 80:11,23 81:23 82:1,10 83:8,9 84:25 85:4 87:5 88:1,6, 7 92:17,19 93:2,8,9,20, 25 94:4,8,20 95:10,22 96:3 99:2 100:19 101:9 106:17,19 107:6,8,24 108:3,5,7,15 109:21 111:1,3,17 112:24 118:9,14 119:10 120:6, 9,12,20 122:3,25 127:22
**technician's** 55:13 67:12 96:12
**technicians** 9:8,14 11:1, 8,25 12:9,17 13:1,4 15:19 16:3,25 17:4,20 21:3 22:21 23:9 25:5 28:11,13 29:8,19 30:1 32:18,22 34:3,18 35:20,

22,25 36:1,7,8,9,13
37:9,24 38:5,13 39:1
41:11 42:1,13,15,25
43:23 44:2,17,21,23,24
45:6,10,12,16,17,20
46:13 47:6,9 49:24
50:15 51:16,19,20 53:3
55:2 56:10 57:20 58:4,
21,25 59:7,21 62:23
63:2 64:21 67:16 69:9
74:20 75:1,13,14,22
76:2,18 77:9 78:4,7,11,
15 79:4,8 80:3 81:7,16
82:25 84:20,23 85:6,23
86:3,13,21,24 90:14,17
91:19 94:10 95:15 97:4
98:20 99:13,21 100:2,5,
16 101:3 104:16,22
106:10 107:10 108:5
109:1 118:23 120:5
121:1,5,8 123:5 124:2,
11,17,20 126:9,16
127:12,24,25 128:4,12

**techs** 50:3 51:12,14
117:18

**telecommunications**
37:16,19

**telling** 26:1 31:3 71:5

**ten** 17:13 109:8,10,13,
15,18,25 110:8,21
111:5,8

**ten-point** 110:19

**tenure** 42:18 56:14

**term** 16:1 39:8 43:2 49:1
112:10,21

**terminology** 112:8

**terms** 11:15 25:18 26:15
42:25 47:1 52:18 64:21
68:23,25 69:2,3,5,8
75:19 82:7,21 118:20
127:8

**Terraine** 60:15

**terrible** 19:23

**tertiary** 57:16

**Teshan** 18:19 19:5,6

**testified** 57:19 111:15
121:4

**testify** 6:18 90:9,17
119:4

**testimony** 27:18 30:5
70:14 100:10 110:24
119:9

**thing** 40:16 50:20,21,24
55:23 63:6 73:3 76:17
80:6 81:14 102:16
122:25

**things** 12:7 14:22 40:9,
15 52:11 58:8 66:7
84:22 85:2 127:8,12

**thinking** 27:13

**third-party** 75:21

**thought** 57:18 58:16

**tickets** 127:11

**tied** 14:23

**time** 10:11 16:5,17
17:12,19 21:18 34:21
38:21 39:21 42:16 52:5
56:25 59:11 60:2,3
61:23,24 62:1,2,5,15,25
63:3 65:16 66:7,15
73:17,19 93:9,13 94:11
97:18 101:13 108:19
111:17,24 115:10,12,
13,15,16 116:9,12,23
117:5 118:1,2,15,18,19
120:8,20

**times** 13:20 38:19 45:24,
25 56:3,13,16 59:17
67:8 103:12

**title** 8:6,12,22 9:18 12:1
14:24 19:2 39:5

**titles** 39:8

**today** 26:17 27:2 36:12
53:6 85:20 97:3 98:19
103:24

**told** 7:9 23:6 25:12 26:7,
18 27:3 28:9 29:18 34:2
53:10

**tool** 121:14,25 122:1,2,
4,6,8

**tools** 77:8,15,18,19,24,
25 78:2,3,4,5,6,7 121:2,
8,10

**top** 21:17 35:10 74:12

**total** 92:17 93:7,20 94:3
114:20 115:6

**track** 40:9 56:3,9 92:17
93:7,9,19

**tracked** 118:15,17

**tracks** 93:19,25

**traffic** 127:11

**training** 46:7,10,11,21
49:20

**treats** 17:19

**Treaudo** 56:13

**trial** 98:12 124:2

**troubleshoot** 48:3

**truck** 55:16 123:2

**true** 57:21 61:20 94:21
95:1 108:19 109:5
111:13,22 112:4,7

**turn** 42:1

**turned** 94:14,18 95:3

**twenty** 21:6

**type** 35:7 45:8 46:7
50:21 52:11 56:20 59:4
75:20 76:11,17 80:4

85:19,20 106:11 122:6

**types** 22:18 75:24 84:22

**typically** 13:18 43:9
44:19 45:19 46:10,12,
16,20 49:23 51:21
55:12,18 65:17 75:21
76:8 78:6 80:2,14,20
85:12 118:8 119:10,17
127:9

---

## U

**Uh-huh** 52:2,6

**ultimate** 11:8

**ultimately** 124:10

**undergo** 76:18

**understand** 7:14 8:2 9:4
14:8 17:18 27:6 32:24
34:12,20 36:16 53:9
57:8 67:21 71:14 77:23
95:5,19 99:7 102:22
115:20

**understanding** 33:5,7,
12,19 37:17,21 108:24

**understood** 7:20

**uniform** 80:4,5

**uniforms** 80:3

**utilize** 35:2 84:16

---

## V

**vague** 104:20

**van** 55:6,8 56:1

**Vanessa** 89:9,10 90:1

**variance** 108:4

**varies** 46:17 48:4 62:21
108:3 118:14

**vary** 40:14 69:11 120:18

**vast** 40:17

**vehicle** 80:1 109:2,4
127:10,14,16 128:11

**vehicles** 79:3,7,17
127:17,22,24,25 128:7

**vendor** 79:12 80:8

**versus** 18:3 23:23 99:3,
11 112:2 124:12,21

**visit** 80:21

---

## W

**wait** 118:23

**waited** 120:13,20

**Wallace** 18:19

**wanted** 26:11 48:16
56:12 63:23 65:9 66:3
79:20 82:1,18,24 96:19
116:24 121:13 122:12,
17

**warehouse** 19:10,25
54:21 55:4,9,19,25
56:4,13,18,19 78:14,18
93:17 94:1 118:2,9,16
119:12,23 120:7

**warrant** 86:1

**waste** 65:16

**wear** 80:4

**week** 56:2,5 96:13
114:25 115:21,22
118:10

**weekly** 34:8 96:11

**weeks** 46:18,20 56:2

**whatsoever** 85:19 91:18

**whim** 65:25

**Whitney** 36:17,21

**will-staffed** 15:21

**wire** 48:3 121:12,14
122:11,13,14,15

**wiring** 78:8,9,13,19
122:11 123:4

**word** 42:19

**worded** 7:14

**words** 115:21

**work** 13:18 16:15,18
30:1 31:12 37:23 38:4,
13,25 39:3,24 40:22
41:17 42:21 43:8,11,14
47:4,5 53:6 55:8 57:3,
11,20 58:2,3,4 59:10,22
60:4 61:4 63:24 73:21
76:16 80:21 82:2 86:12,
14,20,23 87:6 89:15,17
94:21 102:11 106:11,18
108:5 109:22,23,25
110:6,7,10,17,24 111:6,
14,15,23,25 112:11,21

**workday** 117:13

**worked** 19:25 22:3
36:13 92:17 93:8 94:4,
11 96:13 99:11,22
100:6,17 101:4 102:4
103:12 124:16 127:15

**workers** 15:24

**working** 20:25 39:4
47:19 53:5 67:19 85:5
95:15,22

**works** 19:10 83:25 84:3
89:16 93:20

**workweek** 94:4,21
95:15,23 96:2 103:11

**worth** 108:16 109:8,13
110:7,11 111:5,8 113:1

**wrapping** 126:1

**wrong** 22:5 37:22 61:17
108:25

---

## Y

**y'all** 44:23 84:5

**year** 17:9 18:1 21:8
39:20 87:13 97:4 98:19
99:1

**years** 8:14,24 9:7 16:11
37:15 38:3 51:24 75:13
89:21

---

## Z

**Zimmer** 6:1,2 30:6,14,23
31:5,15,21 32:3 69:18
70:2,10,17,22 71:3,11

**Zoom** 6:12